**Norman LeRoy JOHNSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1477.**

Supreme Court of Alaska.

June 15, 1973.

William H. Fuld, of Kay, Miller, Libbey, Kelly, Christie & Fuld, Anchorage, for appellant.

Robert L. Eastaugh, Asst. Dist. Atty., Seaborn J. Buckalew, Jr., Dist. Atty., Anchorage, John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

RABINOWITZ, Chief Justice.

Norman LeRoy Johnson was convicted of three counts of second degree murder

following a non-jury trial in superior court. The principal contentions raised in this appeal concern the doctrine of diminished capacity and burden of proof as it relates to the defense of insanity.

The relevant facts and pertinent expert testimony relating to the defense of insanity will be set forth in some detail. Appellant Norman Johnson moved to Alaska in 1969 with his parents. His father was employed by the Alaska State Housing Authority and during January of 1970, was working in Kiana while Norman was attending Anchorage Community College. Thinking that his son would enjoy a trip into Alaska's interior, Mr. Johnson invited Norman, who was then 19 years old, to spend his semester break vacation with him in Kiana. After Norman had been in Kiana for a few days, his father arranged for him to go on a caribou hunt. It was planned that Norman would accompany Freddy Jackson, a Native and a friend of Norman's father, to a hunting camp on the Kobuk River, about 70 miles from Kiana, where they would join two other Natives, Clarence Arnold and Oscar Henry. Norman and Freddy Jackson left Kiana by snowmobile. They reached camp that evening, had dinner with Arnold and Henry, and then went to bed.

The following morning they began to hunt. Norman was riding in a sled behind Jackson's snowmobile. During the hunt, Norman was thrown from the sled and left behind by the hunters. When he caught up with them eventually by foot, he found that they had finished with their hunting and were butchering the caribou they had killed. At this time Norman watched Ar-

nold and Henry cleaning and butchering a female caribou that apparently had an unborn calf in its womb. He later told Dr. Ure, one of the examining defense psychiatrists

> that . . . this baby never had a chance, you see, and he thought that Freddy . . . was a little callous in not too caring and he had the same feeling of feeling sick to his stomach.

After this episode, Norman accompanied Jackson, Arnold and Henry back to the camp.

Upon returning the men prepared dinner. During these preparations, another Native, Clarence Wood, stopped by the campsite. He stayed for about an hour, had dinner, and then departed on his way back to Ambler at about 7 p. m. Wood testified through an interpreter that while he was there Norman lay on his bed, all huddled up, that he hardly said anything, but would answer when spoken to. Other than that, he did not notice anything unusual about Norman.

Sometime after Wood left the campsite, Jackson, Arnold, and Henry began making preparations for bed. Norman later told the state troopers that:

> I got up to go to the bathroom and I went outside and I went and I got my rifle and I just started firing into the tent.

The prosecution's evidence showed that the bullets were fired from outside the tent, and that Jackson, Arnold and Henry were inside the tent during the shooting. At one point, Jackson attempted to come out of the front of the tent and was shot by Johnson as he was coming out. All three men had numerous bullet wounds.[1]

---

1. Dr. Bierne of the Alaska Medical Laboratory performed autopsies on all three bodies. He testified that Jackson had four wounds, one in the upper left arm, one in the left buttocks, one in the left forearm, and a large wound in the upper right arm. Bierne testified that Jackson bled to death. Clarence Arnold suffered six wounds from at least four different bullets: one in the upper right arm, a large wound in the side below the ribs, a wound in the back between the shoulder blades, a scalp laceration, a wound in the right hip and one in the left wrist. Arnold apparently died of multiple gunshot wounds. Oscar Henry had three wounds: one in the back of the neck at the base of the skull (which resulted in instant death), one in the left leg and one in the right leg. Bierne also testified that probably several minutes elapsed between Clarence Arnold's right hip wound and the side wound.

Following the shooting, Johnson went back inside the tent and put on some more clothing. After failing to start one of the snow machines, he then started out on foot for Kiana, following a snowmobile trail leading up the Kobuk River.

The next day two hunters were flying in a small airplane in the Kobuk River area searching for wolves. They noticed a dark object by the river and when they flew down close to the ground, they realized it was a man. They landed the plane, and the man told them he was Norman Johnson, was from Kiana, and that three men were dead in the camp down the river.[2]

Trooper Boatright of the Alaska State Troopers testified that he talked to Norman briefly on the day he was taken back to Kiana. He stated Norman was

> still under shock. He was cold, he was shivering, and all he could indicate to me at that time was that his name was Norman Johnson and that he had been up at a camp where there had been a shooting and he didn't recall too much more of what happened.

The following day Boatright talked to Norman again. At this time Boatright found Norman to be "calm and able to converse without any trouble." During this interview, Norman told Boatright an exculpatory tale concerning the events of his hunting trip with Jackson, Henry and Arnold.[3] Two days later Norman was taken to trooper headquarters for another interview. In the course of this interview, Norman confessed to having committed the shootings at the camp.[4]

Norman Johnson's defense at trial was based on showing that at the time of the slayings he was suffering from a mental disease or defect such that he was not responsible for his actions. In this regard, Dr. J. Ray Langdon testified that he had examined Norman and had reviewed the records of the investigation, some of Norman's previous medical history, as well as results of tests performed by a clinical psychologist. Dr. Langdon found that Norman was not at the time of the examination overtly psychotic or irrational, but that the tests and history showed evidence of severe mental illness, namely, a latent schizophrenic process which, if it became an overt psychosis, would most likely be of a paranoid or persecutoid type.

Dr. Langdon stated that the circumstances surrounding the incident as related to him by Norman could have accounted for a "decompensation" of the schizophrenic process resulting in an overt but brief psychotic episode. He also stated it was

2. Norman was picked up approximately 20–30 miles from the camp.

3. He told Boatright that shortly after Clarence Wood left the camp he crawled into his sleeping bag and the other three men prepared for bed. At this time another man approached the camp on a snowmobile. He came to the entrance of the tent and talked to the three men in Eskimo. He appeared to be acquainted with the three men. This man stayed to have a cup of coffee. Just prior to his leaving, some kind of argument developed. The man got up and left, started his snow machine, and then turned it off. The next thing Norman remembered was hearing gunshots and then Freddy Jackson fell across him. Norman indicated that he crawled out the back of the tent and hid among some nearby trees until the shooting stopped and he heard the snow machine take off. He went back into the camp, put on more warm clothing and then attempted to start one of the two snow machines the men had brought to the camp. Unable to do so, he began walking down the river toward Kiana and was picked up the following morning by a pilot flying down the river. Norman described the stranger to the trooper in some detail.

On the evening of the day of this second interview, Norman and his father left Kiana for Anchorage. They were met at the Anchorage International Airport by State Trooper Ule Bivens. Bivens went out to the Johnson house the following morning and talked to Norman about the shooting incident. As a result of this interview, Trooper Bivens prepared a statement which Norman signed. This statement contains substantially the same information that Norman had given to Trooper Boatright the previous day.

4. The trial court found this statement was voluntarily made. This ruling has not been challenged in this appeal.

possible that because Norman was in a totally unfamiliar situation, in the extremely cold Arctic wilderness,[5] with three Eskimos, his mental illness might have become overt. The doctor also testified that the emotion that would accompany the type of acute decompensation that Norman went through would be "primarily a panic." Finally, Dr. Langdon testified that in his opinion

> I feel [Norman] probably knew the nature and quality of actions but that he did not believe it was criminal or wrongful at the time.

Dr. Barbara Ure, a psychiatrist, also testified in Norman's behalf. On the basis of extensive interviews, Dr. Ure found evidence that Norman was a fetishist. Her opinion as to why Norman had shot and killed his three hunting companions was as follows:

> [T]hat the ego of the fetishist is what is involved in this killing, . . . is he identified with the baby and the mother [caribou] the lost—compromised his own body image which was already fairly well compromised, that is, he was insecure as to who he was, having lost contact with his culture, with his geography, he was pretty much displaced . . .
>
> .   .   .   .   .   .
>
> [T]hen these men would become the enemy, you see, and he—they—he could be killed by them just like this caribou was and this baby caribou . . . really it's the baby that never had a chance because this is Norman in a certain sense . .. . who really never had a chance . . . .. [H]e did not get up to urinate, he did have an erection, not a sexual sort of thing but in a sense of asserting his identity, preserving his—his survival and that it was totally incongruous to even consider the possibility of mastur-

bating but then there's one other point that is when a fetishist cannot deny his identification with his mother he generally does break down, you see, and so this is what I think did happen and that I do believe he did see the tent . . . and that his survival was threatened and that he doesn't know what he was doing and that he shot in self defense.

Finally, Dr. Ure testified in response to an inquiry as to whether Norman knew the nature and quality of his act when he did the shooting:

> For the moment he didn't realize what he was doing. He knows that you're not supposed to shoot people . . . but for the moment this took a second place because he had to save himself from an —a danger which suddenly became very real. This danger was inside but he thought it was outside.
>
> .   .   .   .   .   .
>
> . . . well he knew it was wrong as soon as he had done it but not at the time he was doing it.

She also stated that she believed his act was the product of mental disease.

Dr. John Rollins testifed for the state. He had examined Norman pursuant to court order. In his opinion, Norman showed no signs of mental disease, disorder or defect that would preclude him from being able to conform to the law. He further testified that he believed Norman had the capacity to deliberate about the acts he was committing, particularly because of his ability to recall details of the events.

Dr. Walter Rapaport testified for the state on rebuttal. Rapaport had not examined Norman. He was permitted, over defense objection, to review a transcript of the testimony of Drs. Langdon and Ure, as well as their reports prior to testifying.[6]

---

5. There was testimony that the temperature in the area of the hunting camp during the time in question was approximately 50 degrees below zero.

6. At the start of trial, defense counsel asked that witnesses not under examination be excluded from the courtroom, pursuant to Crim.R. 26(a). The basis of the objection to Dr. Rapaport's examining the transcript of the testimony of the other psychiatrists was that it would violate the exclusionary rule.

Rapaport found no evidence of mental illness in Norman Johnson. He stated he believed Johnson was capable of premeditation, malice aforethought, and that Johnson had the mental capacity to appreciate the nature and quality of his acts as well as their wrongfulness. His opinion was based on the fact that Norman remembered a good deal about the episode, the evidence of flight and concealment, and the absence generally of any symptoms of major mental illness. He stated that fetishism is not a symptom characteristic of any particular illness, although it may be associated with mental illness. Regarding this case, he stated:

> [T]his [evidence of fetishism] in nowise [sic] would alter my opinion as to his mental capacity relative to issues which I have given an opinion.

The superior court applied the American Law Institute Model Penal Code test for criminal insanity.[7] Although it placed the burden of proof as to the insanity upon appellant, more particularly, Johnson was required to overcome the presumption of sanity by a preponderance of the evidence. In its findings regarding Johnson's state of mind, the trial court stated in part:

> Applying the [A.L.I.] rule to the testimony, primarily of the psychiatrists and by further removing the speculative aspects of their testimony or their subjective presumptions, I find that, using the ALI test, the Defendant does not meet the test and is, therefore, responsible for his criminal conduct.
>
> His substantial recall of the sequence of events during the shooting, attempts to cover his actions and withholding details attempting to avoid responsibility also all tend to show a substantial capacity to appreciate the wrongfulness of his conduct, and an attempt to conform

his conduct to the requirements of law. I recognize that some testimony exists that Defendant may not have been aware of what he was doing, but there is no testimony that any such lapse was, except by speculation and conjecture, due to any substantial mental and disease or defect. I thus find that the Defendant has failed to carry the burden by a preponderance of the evidence that his actions were caused by mental illness.

The superior court then went on to determine the appropriate degree of homicide stating:

> There is testimony that Defendant is below average mentally and further that his conduct is not entirely normal, although not mentally ill as defined by the test used. Defendant suffers from a fetishistic disorder, and there is question concerning his development towards maturity. Further, Defendant probably underwent some stresses due to the cold; remoteness of the area where the incident took place; the foreign language used around him and perhaps even the inability of Defendant to keep up with the experienced hunters. I merely review this to assist in determining the ability of the Defendant to premeditate, and to experience malice aforethought. The stresses, individually, are not sufficient to be seriously considered. Collectively, however, it could with any provocation such as anger, fear, jealously, etc., cause some irrational or impassioned behavior. The description of the hunting scene, the testimony of the psychiatrists highlighting feelings of persecution and the evidence in general fails to show any premeditation.
>
> .   .   .   .   .   .
>
> . . . [T]he state has proven beyond a reasonable doubt the unlawful

7. Section 4.01 of the American Law Institute Model Penal Code (Final Draft) (1962) provides:
   (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
   (2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

killing by a Defendant presumed sane. The facts show that the defendant acted in a deliberate manner while performing the homicidal acts. Such substantiates the element of malice aforethought necessary for a verdict of murder in the second degree and I so find the Defendant.

The superior court subsequently determined that Johnson should receive three concurrent terms of life imprisonment "with the understanding that he obtain psychiatric treatment and that the parole board release him when they are convinced that he is no longer a danger to society and he has received his treatment." The judgment of conviction entered by the superior court contained a reference to Norman Johnson's need for psychiatric care. The judgment omitted any reference to the fact that Johnson was to be released when the parole board was convinced that he is no longer a danger to society. Johnson has appealed from the trial court's judgment of conviction and the sentences which were imposed.

Johnson's first specification of error is to the effect that the trial court erred in failing to grant his motion for judgment of acquittal made at the close of the prosecution's case as to all counts of first and second degree murders. Johnson argues that even if the trial court properly found that he was not suffering from a mental disease such that he should be completely absolved of criminal responsibility, the court should have applied the doctrine of diminished capacity. Under that doctrine, Johnson contends that since the prosecution's evidence failed to show malice, an essential element

of both first and second degree murders, he was erroneously convicted of three counts of second degree murder.

The state argues that there was sufficient evidence to support a finding that Johnson acted out of malice and was guilty of homicide in the second degree. Viewing the evidence in the most favorable light, the state asserts that the following facts show the existence of malice and purpose to kill:

(1) Johnson had to leave the tent to get to the rifles; (2) the first shots were fired from his own rifle, indicating selection; (3) to use his rifle it was first necessary for Johnson to remove it from its case; (4) Johnson had to go to where the rifles were stored; (5) he fired at least 10 shots from at least two rifles; (6) the shots showed aim, as judged by the terrible destruction of life, by the patterns of holes in the tent and in the victims, and by the shot which struck Freddy Jackson as he emerged wounded from the tent; (7) finally, the pattern of shots showed that Johnson changed his position.

The state further argues that this court should not adopt the doctrine of diminished capacity since it would impose an added burden on the prosecution in proving intent beyond a reasonable doubt, particularly because this defense, unlike a defense of insanity, can be brought up without prior notice to the state.[8] The state also argues that the court, in fact, applied the doctrine of diminished capacity, and that there was sufficient evidence to support the trial court's conclusions that Johnson was guilty of second degree homicides.

---

8. After Johnson's trial had taken place, the legislature enacted a statute, the effect of which appears to provide for the defense of diminished capacity. We do not at this time have the question before us as to whether this statute provides for the defense of diminished capacity. The statute reads in part as follows:

*Evidence of Mental Disease or Defect*
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove

the defendant did or did not have a state of mind which is an element of the offense. However, evidence of mental disease or defect excluding responsibility is not admissible unless the defendant, at the time of entering his plea of not guilty or within 10 days thereafter or at such later time as the court may for good cause permit, files a written notice of his intent to rely on that defense. AS 12.45.085.

█ From the record, it is apparent that the trial court did apply a diminished capacity doctrine in determining that Norman Johnson was not guilty of first degree murders. The diminished capacity doctrine is based on the theory that while an accused may not have been suffering from a mental disease or defect at the time of his offense, sufficient to absolve him totally of criminal responsibility, the accused's mental capacity may have been diminished by intoxication, trauma, or mental disease to such an extent that he did not possess a specific mental state or intent essential to the particular offense.[9] In the case at bar, the trial court found that "the evidence in general fails to show any premeditation," and also mentioned the stresses that were bearing upon Johnson at the time of the shooting. Although the court did not state explicitly how these stresses worked to negate premeditation, it did appear to take these matters into account.

Nevertheless, Johnson argues that a reasonable man necessarily must have had a reasonable doubt as to whether he acted with malice aforethought, and therefore he could not have been found guilty of murder in the second degree.[10]

9. People v. Conley, 64 Cal.2d 310, 49 Cal. Rptr. 815, 411 P.2d 911, 914 (1966).

10. The state has argued in its brief that while the doctrine of diminished capacity may be applied to reduce the crime of first degree murder to second degree, it cannot properly be used to reduce murder to manslaughter. Manslaughter is a statutory offense and one that involves an objective test requiring evidence of heat of passion that would provoke a "reasonable man" to kill. Thus, the state argues that the subjective processes of the defendant's mind have no relevance to the crime of manslaughter. This rationale is taken from Weihofen & Overholser, Mental Disorder Affecting Degree of Crime, 56 Yale L.J. 959, 969 (1947).

Alaska's manslaughter statute contains no listing of factors which constitute the crime of manslaughter. AS 11.15.040 provides:

Except as provided in §§ 10–30 of this chapter, a person who unlawfully kills another is guilty of manslaughter, and is punishable by imprisonment in the penitentiary for not less than one year nor more than 20 years.

In Jennings v. State, 404 P.2d 652 (Alaska 1965), this court discussed the relationship between second degree murder and manslaughter. In holding that involuntary manslaughter was necessarily included in the offense of second degree murder, we said:

The gravamen of involuntary manslaughter, as so defined, is a homicide which is unlawful—one that is not excusable under the law. Second degree murder is also a homicide which is unlawful—one that is not excusable under the law. It is true that second degree murder requires malice and a specific intent to kill, whereas involuntary manslaughter does not. *But this difference relates only to the state of mind of the accused and bears upon the degree of punishment.* The gravamen of the two offenses, an unlawful killing, is the same. 404 P.2d at 655 (Emphasis supplied.)

Similarly, the Supreme Court of California rejected the argument proposed by the state in this case in People v. Gorshen, 51 Cal.2d 716, 336 P.2d 492 (Cal.1959). In *Gorshen*, the court found that while the California statute enumerated the nonmalicious criminal homicides constituting manslaughter, it did not include a homicide in which the lack of malice results from diminished capacity. The court nevertheless held that a person who intentionally kills another may be incapable of harboring malice aforethought because of a mental disease or defect and his offense would be voluntary manslaughter.

Under Alaska's manslaughter statute, one could be convicted of manslaughter for an unlawful killing if it were not committed purposely and of deliberate and premeditated malice (first degree murder) or purposely and maliciously (second degree murder). Although not necessary to the resolution of this issue, we note our reservations concerning the applicability of the doctrine of diminished capacity to reduce murder to manslaughter. Nevertheless, assuming arguendo that application of the diminished capacity doctrine was proper in the case at bar, the trial court should have considered the evidence relating to Norman Johnson's state of mind with respect to his capacity to harbor malice. In this context, the state correctly casts the issue before this court as one of sufficiency of evidence.

Criterion for review of sufficiency questions in criminal cases has been stated by this court in the following manner:

In determining the issue raised by such a challenge, the evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt. (Footnotes omitted.) [11]

Since malice was an essential element of second degree murder, that element should have been proven beyond a reasonable doubt, and the narrow question on appeal in this case is whether the trial court's finding that there was malice is supported by substantial evidence that is "adequate to support a conclusion . . . that there was no reasonable doubt" as to that element.

In Gray v. State, 463 P.2d 897, 901 (Alaska 1970), we discussed the element of malice in homicide:

Murder, at common law, was defined as the unlawful killing of a human being with malice aforethought, either express or implied. Express malice could be found in the deliberate intention of the defendant to take the life of the deceased unlawfully, while implied malice could be found either where the evidence showed circumstances indicating that . . . he knowingly did an act which might result in death or grievous bodily harm, or where defendant killed another in the course of perpetrating a felony.

■ Based on our review of the record, we hold that the prosecution's evidence showed that Norman Johnson acted with malice. The prosecution's evidence disclosed that Johnson walked out of the tent, went over to where the hunters' guns were kept, picked up his gun, and began firing into the tent knowing his three companions were inside. From these acts it may reasonably be inferred that he knew death would result from firing into the tent. Although the prosecution did not show any particular reasons why Johnson may have intended to kill the three men, the fact that he aimed and fired in their direction is enough to infer malice.

The defense countered the implication of malice by psychiatric testimony that Johnson was suffering from a major mental illness, and that at the time he shot his companions, he believed the act was necessary to save his own life. In this regard, the testimony of Drs. Rollins and Rapaport was in direct conflict with the testimony of Drs. Ure and Langdon. Rollins and Rapaport both failed to find any evidence of a major mental illness and stated that Johnson had the capacity to appreciate the wrongfulness of his acts. Although they did not specifically testify that Johnson was not acting under a delusion that his life was in danger, that was the import of their testimony and a fair inference to be drawn therefrom. Since the trial court, as the trier of fact, was free to resolve this conflict in testimony by rejecting the theories of the defense psychiatrists, we find there was "substantial evidence" that Johnson acted with malice. We therefore hold that the trial court did not err in denying Johnson's motion for judgment of acquittal as to all counts of second degree murder.

■ Appellant has also specified as error the trial court's ruling which permitted Dr. Rapaport, the prosecution's expert rebuttal witness, to testify after he had read the testimony of Drs. Ure and Langdon, expert defense witnesses. Johnson asserts this ruling was erroneous because the court had, under our rules of procedure, at the beginning of the trial excluded witnesses

11. Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

from being present in the courtroom while other witnesses gave testimony.[12]

In Dickens v. State, 398 P.2d 1008 (Alaska 1965), we held that the exclusion of witnesses is within the trial court's discretion. Dr. Rapaport stated that his opinion was not influenced in any way by the conclusions of Drs. Ure and Langdon, but that he utilized their testimony primarily to gain an understanding of the factual data on which they based their opinions and conclusions. Given the circumstance that Dr. Rapaport used only the factual data contained in the testimony of Drs. Ure and Langdon, we hold that the trial court did not abuse its discretion in permitting Dr. Rapaport to testify, despite its previous order excluding witnesses not at the time under examination.[13]

■ Another point raised is Johnson's contention that the trial court's imposition of three concurrent life sentences for three counts of murder in the second degree was excessive. Under the sentencing objectives set forth in State v. Chaney, 477 P.2d 441 (Alaska 1970), the trial court is to consider several factors: rehabilitation, protection of society, deterrence of the offender, deterrence of other members of the community, and reaffirmation of societal norms. Our review of the record convinces us that the trial court considered these criteria. Under the "clearly mistaken" standard of review of Chaney and Nicholas v. State, 477 P.2d 447, 449 (Alaska 1970),[14] we cannot say that the concurrent sentences imposed in this case were excessive.[15]

■ Johnson's final point is that the trial court erred in placing the burden of proof as to insanity upon him. The state argues that the better rule requires that the accused rebut the presumption of sanity by a preponderance of the evidence. The state further contends that any other rule would place an impossible burden upon the state in practical terms.

In its opinion, the trial court stated that

as to the burden of proof when sanity is made an issue, I must agree with the State's position . . . it is my opinion that the presumption of sanity and responsibility must be strongly adhered to subject to the normal rebuttal ability

12. Civ.R. 43(g)(3) which is made applicable to criminal proceedings by virtue of Crim.R. 26(a) provides:

At the request of any party, the court may exclude from the courtroom any witness of the adverse party not at the time under examination, so that he may not hear the testimony of other witnesses.

13. Regarding Johnson's assertion that Dr. Rapaport's testimony should be disregarded and stricken because he never examined the patient, we note that appellant's brief contains no argument as such on this question or citation of authority. In such circumstances, we choose not to decide the point. Lewis v. State, 469 P.2d 689, 691 n. 2 (Alaska 1970).

14. As we held in Hixon v. State, 508 P.2d 526 (Alaska 1973), the appellant must demonstrate that the sentence was not within the zone of reasonableness.

15. We agree with appellant's observation that the better practice is for the trial court itself to prepare the judgment and commitment in criminal cases.

Concerning the judgment and commitment, appellant contends that there is a variance between the written commitment and the orally imposed sentence in that the commitment does not contain the trial court's recommendation that the parole board release Johnson when he is no longer a danger to society. In the event the judgment of conviction remains intact after one limited remand, hereinafter to be discussed, then we see no necessity for amendment of the judgment and commitment for we think it implicit under AS 33.15.180 that the parole board has the power to parole Johnson when it is persuaded he is no longer a danger to society. AS 33.15.080 provides:

If it appears to the board from a review that a prisoner eligible for parole will, in reasonable probability, live and remain at liberty without violating the laws, or without violating the conditions imposed by the board, and if the board determines that his release on parole is not incompatible with the welfare of society, the board may authorize the release of the prisoner on parole.

to overcome this presumption by a preponderance of the evidence.

Since the judgment and commitment was entered in this case, Alaska's legislature enacted the following statute treating the subject of mental disease or defect and criminal responsibility:

Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.[16]

Our colleague Justice Connor, in his dissent in Pope v. State, 478 P.2d 801, 812–814 (Alaska 1970), forcefully presented the case for adoption of a burden of proof standard similar to the one selected by Alaska's legislature in 1972. We adopt the reasoning of the dissenting opinion in *Pope* and now hold that the burden of proof standard formulated by our legislature is the appropriate standard, and that the issue of criminal insanity should be decided under that criterion.

Thus, in light of the foregoing, we hold that the case should be remanded to the trial court for the limited purpose of reviewing the evidence going to the insanity defense issue in light of the burden of proof standard articulated in AS 12.45.083. Upon remand, the trial court is to hold such proceedings it deems necessary and to make any additional findings of fact and conclusions of law considered appropriate in light of the purposes of this limited remand.

Remanded for further proceedings in accordance with this opinion.

FITZGERALD, J., not participating.

16. AS 12.45.083 (b). This statute was not made retroactive.