Regina Teresa BOWKER, Appellant,

v.

STATE of Alaska, Appellee.

No. 132.

Supreme Court of Alaska.

July 5, 1962.

Harold J. Butcher, Anchorage, for appellant.

James C. Merbs, Dist. Atty., Dorothy Awes Haaland, Asst. Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, Justices.

DIMOND, Justice.

Regina Bowker shot her husband on April 24, 1959, following marital difficulties. He died as a result of the gunshot wounds three days later. She was indicted and tried for first degree murder, and found guilty by a jury of murder in the second degree. On this appeal Mrs. Bowker (who will hereafter be referred to as the "defendant") presents several questions for review—the principal one relating to her defense of insanity.

1. *Insanity.*

The defendant claimed that when she shot her husband she was insane and didn't know what she was doing. She took the witness stand in her own defense, and testified in considerable detail regarding the factors which caused the alleged temporary insanity—the chief one being the worry and strain caused by her husband's repeated acts of infidelity. In support of this defense a psychiatrist, Dr. Cheatham, was called as a witness. He had seen the defendant for the first time in November 1960, approximately nineteen months after the shooting. He conducted a detailed psychiatric examination which consisted largely of reconstructing the events which led up to the shooting as they were related to him by the defendant, and from this made his evaluation of defendant's personality and mental condition at the time the crime occurred. He testified that at the time of the shooting the defendant was suffering from an "acute disassociative reaction"[1]; that in such mental state she did not have the necessary capacity to formulate a specific intent to kill her husband; that the shooting of the gun was a direct product and consequence of the fact that she was suffering from such mental condition; that she was completely unable to exercise any conscious, willful or deliberate functions; that she

was not possessed of sufficient mental capacity to premeditate the nature of her actions or behavior; and that this condition, which the witness classified as a "mental disease", had begun approximately two hours before the shooting and lasted for "several hours".

The state did not produce an expert witness to testify that defendant was sane at the time of the criminal act. This brings us to the core of defendant's argument. She claims that since Dr. Cheatham's diagnosis of insanity had not been challenged by other psychiatric authority, the jury was not competent to pass upon her mental condition. Therefore, she argues, the trial court ought to have taken the case from the jury and entered a judgment of acquittal; since a verdict of guilty, which would necessarily involve the determination that defendant was not insane, could not be sustained by the evidence.

Defendant finds support for this proposition in Douglas v. United States, a case decided by the District of Columbia Circuit in 1956.[2] It has been said that under the Douglas opinion—

" * * * the case is left in the hands of the jury only if there is disagreement among the psychiatrists or if the expert testimony supports guilt; if the psychiatrists all agree that the defendant has a 'disease' and the act was its 'product,' then the issue is taken from the jury ".[3]

■ We shall not adopt a rule which would treat medical testimony as conclusive merely because it is not disputed by other medical testimony. The jury should be free to make an independent analysis of the facts on which the expert's opinion rests, and thus exercise their historic function of passing on the credibility of the

1. Dr. Cheatham defined this as meaning "a dreanlike, [sic] foglike state in which there was a loss of contact with reality, in which there was an interruption or a disruption of the stream of consciousness, and a loss of any conscious control or

conscious wilful [sic] exercise of restraint over her actions and behavior."

2. 99 U.S.App.D.C. 232, 239 F.2d 52 (1956).

3. Blocker v. United States, 110 U.S.App. D.C. 41, 288 F.2d 853, 863 (1961) (separate opinion of Judge Burger).

witness. If we were to follow Douglas and accede to defendant's argument that the jury was not competent to pass on her mental condition because of Dr. Cheatham's testimony, we would be transferring the jury's function to the psychiatrist and substituting a trial by experts for a trial by jury.

■ It is true, of course, that psychiatric opinion constitutes evidence to be considered by the jury. But it is not binding; the jury has the right to also consider other evidence even though it may be non-expert in character.[4] Here the jury saw and heard the defendant who had testified at length in her own defense.[5] From what she related to them, and her obviously clear recollection of events that took place before, during and after the shooting, the jury had the right to conclude that defendant knew what she was about at the crucial time. The jury also heard from a police officer who testified as to what the defendant told him shortly after the shooting. They had the right to believe that her statements to this witness were rational, that this evidenced a sound mind at the time the crime took place, and that she should therefore be held criminally responsible for what she had done.[6] We agree with the view expressed by Judge Holtzoff in the Fielding case that "strong reliance should be placed on the common sense and the feeling for substantial justice possessed and applied by the average jury", and that juries generally have "keen discernment and exercise a sound judgment." [7] We find from all of the evidence in this case that the issue of defendant's mental condition was properly submitted to the jury, and that its decision should not be disturbed. The trial court did not err in refusing to grant defendant's motion for a judgment of acquittal.

■ It is appropriate at this point to mention another aspect of this matter. The trial judge had instructed the jury that once some evidence of insanity had been introduced, the presumption of sanity would no longer control and the burden would then be on the state to prove beyond a reasonable doubt that the defendant was sane when she shot her husband. It is no longer proper to give that instruction in this jurisdiction. In our recent decision in Chase v. State, decided March 27, 1962, we established the rule that where the defense of insanity is relied upon, the burden is on the defendant to prove insanity by a preponderance of the evidence.[8] On this appeal, however, the result would be the same, whether one or the other of the two rules on degree and burden of proof had been used. Applying the rule adopted by the court below, we find from the evidence that the jury was warranted in concluding, beyond a reasonable doubt, that defendant was sane when she committed the criminal act. Applying the rule which now prevails in Alaska, we cannot say that a jury would have been wrong in determining that defendant had failed to prove her insanity by a preponderance of the evidence. In short, the verdict of guilty, which involved a decision that defendant was not insane, is sustained by the evidence.

## 2. *Other Alleged Errors.*

A number of points raised on this appeal are based on questions and remarks of the trial judge which defendant claims

---

4. Dusky v. United States, 295 F.2d 743, 754, 757 (8th Cir.1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962).

5. The defendant's testimony under both direct and cross-examination takes up over 200 pages of the transcript.

6. Holloway v. United States, 80 U.S.App. D.C. 3, 148 F.2d 665, 667 (1945), cert. denied, 334 U.S. 852, 68 S.Ct. 1507, 92 L. Ed. 1774 (1948).

7. We express agreement with Judge Holtzoff despite reversal of his opinion by the Court of Appeals for the District of Columbia. United States v. Fielding, 148 F.Supp. 46, 55 (D.D.C.), rev'd 102 U.S. App.D.C. 167, 251 F.2d 878 (1957).

8. Opinion No. 78, 369 P.2d 997, 1003 (Alaska 1962). This decision was rendered approximately one year after Mrs. Bowker's trial.

were prejudicial. The first incident occurred when, during cross-examination by the state, the defendant was asked to demonstrate the shooting. She complied with this request—her counsel making no objection.[9] As she was demonstrating the manner in which she had held the pistol with her finger on the trigger, the district attorney asked what happened when her husband came in the door. She answered "He came to the door—and I shot him * * *." The transcript of record then shows that the "witness collapsed". The court recessed for fifteen minutes, and upon reconvening the following exchange took place between defendant's counsel and the trial judge:

"MR. BUTCHER: If Your Honor please, I had suggested to Mrs. Bowker that if she feels she cannot continue at this moment because of her condition, that I would ask for a recess. But she says that she believes she can go on and she will try.

"THE COURT: Very well. I'll continue this trial providing there are no more incidents such as this occurring during the trial. We can't have a fair trial under these circumstances. You may proceed.

"MR. BUTCHER: Your Honor, I didn't understand Your Honor about incidents. There was no control—Mrs. Bowker had absolutely—

"THE COURT: I'm not inferring that. I'm saying that if they continue to happen we obviously can't have a fair trial.

"MR. BUTCHER: Yes, I understand, but—

"THE COURT: I'll have to declare a mistrial if they happen again.

"MR. BUTCHER: I have talked to her and I have suggested that if she feels she should have a doctor or she feels she should go rest, that I would arrange with the Court and cask [sic] consent, but she says she thinks that she can go on, but if she feels she cannot she will tell me.

"THE COURT: Very well. Let's proceed."

Defendant argues that the court's remarks regarding a mistrial inferred to the jury that the fainting incident was staged. But the judge clearly stated he was not inferring that. Presumably, defendant's counsel was satisfied with this statement, for he made no objection and did not ask the court for an instruction which might have cleared up any misunderstanding that existed in the minds of the jurors. We find no error here.

Another incident about which defendant complains took place at the conclusion of the cross-examination of the psychiatrist, Dr. Cheatham, and consisted of one question asked by the judge and answered by this witness:

"THE COURT: Doctor, there's a question been going through my mind. Do you base your opinion here on this long hypothetical question Mr. Butcher gave you, incidents that occurred between these two parties during their married life, assuming that she believed everything that happened, that she had reason to believe that he was being unfaithful to her, or she believed he was going to commit her for insanity, or she believed he was going to sell the property out from under her, do all those contribute to your opinion?

"A I would say yes."

Defendant claims prejudice on the ground that the judge's question conveyed

9. In her statements of points on appeal the defendant claims that for the court to permit such demonstration, "over defendant's attorney's objection", was error. The record does not show that any objections were made. Furthermore, it is a general rule that when a defendant has testified in his own behalf and thereby makes himself subject to cross-examination, it is proper to require him to demonstrate actions or positions. State v. Thorne, 39 Utah 208, 117 P. 58, 67 (1911); 2 Wharton, Criminal Evidence, § 660, at 567 (12th ed. 1955).

to the jury the judge's belief that the only basis for the psychiatrist's opinion were the facts related to him by the defendant. Defendant argues that this influenced the jury to ignore other factors involved, such as extensive psychological tests, a brain wave study, and a physical and neurological examination.

We find nothing prejudicial, for the reason that the other factors referred to by defendant were not shown to have had any bearing on the psychiatrist's opinion of defendant's mental condition at the time she shot her husband. Dr. Cheatham testified that a very extensive series of psychological tests had been administered by clinical psychologists under his supervision. But the results of those tests were never divulged. He also testified that he had made arrangements for defendant to have a brain wave study performed at an air force hospital. Again, there is no evidence as to what was found from such study. Dr. Meade did conduct a physical and neurological examination, as defendant alleges. He found that she had a numbness in the right leg and that she had a "certain amount of anxiety which would be manifested by some tension and so forth." But he frankly admitted his lack of qualification to give any diagnosis as to what caused the anxiety, and stated that he did not care to give a psychiatric diagnosis. The record is entirely void of evidence showing any relation between what Dr. Meade found from his examination in January 1961, and what the defendant's mental condition was in April 1959.

In summary, when Dr. Cheatham stated that the events related to him by defendant had contributed to his opinion as to her mental condition, he was simply saying what was true. In fact, earlier during the cross-examination he had answered "Yes" when asked whether he had to "rely considerably" on what the defendant told him,

and stated that this would be true in any psychiatric examination.

■ The defendant also cites various other statements and questions of the trial judge, made in the presence of the jury, as constituting reversible error. One of the instances cited might be interpreted as the judge's attempt at humor; another was what defendant characterized as the judge's effort to rehabilitate an impeached witness; and still another was a brief question asked of defense counsel during his closing argument to the jury. Our review of the record discloses no objections were made by defense counsel to any of these remarks or questions, and therefore if there were errors they have been waived.[10] Furthermore, we have examined the remarks complained about, not isolated out of context, but measured against the environment supplied from the whole record;[11] and we find from this assessment there has been no infringement of defendant's rights.

The last point urged on this appeal relates to certain newspaper publicity regarding the trial. After all of the evidence was in, and before final arguments to the jury, defendant moved for a judgment of acquittal. In denying the motion (the jury being absent) the court made this comment:

"THE COURT: You and I may disagree as to all of the evidence that was introduced, Mr. Butcher; but I recall directly—if you recall I allowed you wide latitude in presenting the difficulties between this man and woman on the assumption that she believed them and the effect they would have on her mind. When Dr. Cheatham was on the stand I asked him whether his opinion was based on the fact of assuming these facts she related to be true, and he answered me that they were. So that leaves a grave question in my mind as to the worth of his

10. United States v. Thayer, 209 F.2d 534, 536 (7th Cir.1954).

11. United States v. Thayer, supra note 10, at 536; Ochoa v. United States, 167 F.2d 341, 344 (9th Cir.1948).

opinion. · He's relying for the most part on statements given to him by Mrs. Bowker. I'm going to deny the motion."

Shortly thereafter the court recessed for the week end and excused the jury until the following Monday.

On Saturday (the day following the court's recess for the week end) a local newspaper carried a front page story of events that had taken place at the trial. In approximately the middle of the news column the reporter, in referring to the judge's ruling on the motion for a judgment of acquittal, said this:

> "Judge Cooper, referring to the question of sanity, said 'I have allowed great latitude in allowing (Mrs. Bowker) to explain the difficulties between (Mr. and Mrs. Bowker) in order to show what effect they might have on her mind.

> "'But,' he continued, 'When I asked (Dr. James Cheatham, psychiatrist and defense witness) on the stand if his opinions were based on Mrs. Bowker's statements to him he answered "yes", so that leaves great doubt in my mind as to the worth of his testimony.'"

Defendant argues that the jurors must have read this account, and that because it expressed the judge's comment on the value of Dr. Cheatham's testimony, it must have influenced the jury against defendant and prevented her from having a fair trial.

This issue was never brought to the attention of the court below. When the court reconvened on the following Monday there was no motion for a mistrial, no request was made to find out which jurors, if any, had read the article, and assuming that some had read it, nothing was done to ascertain the effect it might have had.

 Matters of this type are primarily committed to the discretion of the trial judge.[12] He was in a far better position than this reviewing court to determine whether the newspaper article was likely to have influenced the jury adversely to the defendant. Since defendant did not afford the judge an opportunity to pass upon this issue, we decline to step in and speculate on what effect the publicity might have had. It is not so obviously prejudicial that we can notice the point as "plain error".[13]

The judgment is affirmed.

---

12. Oxenberg v. State, Opinion No. 36, 362 P.2d 893, 899–900 (Alaska), cert. denied, 368 U.S. 56, 82 S.Ct. 189, 7 L.Ed.2d 128 (1961).

13. Crim.R. 47(b) provides "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."