Frank Augie ALTO, Appellant,

v.

STATE of Alaska, Appellee.

No. 2339.

Supreme Court of Alaska.

June 13, 1977.

R. Collin Middleton, Craig M. Cornish, Wagstaff & Middleton, Anchorage, for appellant.

Daniel W. Hickey, Deputy Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

## OPINION

BURKE, Justice.

After a non-jury trial in the superior court, Frank Augie Alto was adjudged guilty of rape,[1] grand larceny[2] and murder in the first degree.[3] Following the imposi-

tion of sentence, Alto filed timely notice of appeal.

The broad issues presented by this appeal are as follows:

1. Did the superior court err in finding appellant guilty of rape?

2. Did the superior court err in finding appellant guilty of murder and larceny, in view of the evidence of mental disease or defect excluding criminal responsibility under AS 12.45.083?

According to the undisputed testimony at trial, Frank Augie Alto brutally beat and killed Marta Matilda Royal at her Anchorage home on August 6, 1973. An autopsy performed by Donald Rogers revealed that three independently lethal injuries caused Ms. Royal's death: (1) numerous stab wounds centered in the left anterior chest area, which penetrated the heart and hilium of the left lung, as well as the pulmonary artery; (2) a torn liver; and (3) a crushed larynx and fractured hyoid bone. In addition, Ms. Royal was severely beaten about the head and face.

The testimony showed that upon leaving the Royal residence, Alto loaded a box with stereo equipment, tapes, a holster, and miscellaneous jewelry, and donned a pair of cowboy boots which belonged to the victim's husband, Robert Royal. While walking toward a neighbor's house, Alto dropped

---

1. AS 11.15.120 provides:
 *Rape.* A person who (1) has carnal knowledge of a female person, forcibly and against her will, or (2) being 16 years of age, carnally knows and abuses a female person under 16 years of age, with her consent, is guilty of rape.

2. AS 11.20.140 provides:
 *Larceny of money or property.* A person who steals money, goods, or chattels, or a government note, a bank note, promissory note, bill of exchange, bond, or other thing in action, or a book of accounts, order or certificate concerning money or goods due or to become due or to be delivered, or a deed or writing containing a conveyance of land or interest in land, or a bill of sale, or writing containing a conveyance of goods or chattels or interest in them, or any other valuable contract in force, or a receipt, release, or defeasance, or a writ, process, or public record, which is the property of another, is

guilty of larceny. Upon conviction, if the property stolen exceeds $100 in value, a person guilty of larceny is punishable by imprisonment in the penitentiary for not less than one nor more than 100 years. If the property stolen does not exceed $100 in value, the person, upon conviction, is punishable by imprisonment in a jail for not less than one month nor more than one year, or by a fine of not less than $25 nor more than $100.

3. AS 11.15.010 provides:
 *First degree murder.* A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life.

the box containing the stolen property. An 8-track tape and the holster dropped out and were abandoned as Alto continued down the road.

Carrying the box, Alto then entered the house of two acquaintances, Valene Foresburg (now Valene Norton) and Frank Norton. Alto initially asked Ms. Forseburg if he could leave the equipment with them because he had been evicted by his landlady. He then tried to sell them the stereo, but his offer was refused.

Alto obtained a clean shirt from Frank Norton since his was soiled. Alto's own shirt was later found by police underneath the license plate of a car belonging to Ms. Foresburg's stepfather. After drinking coffee with Foresburg and Norton and leaving behind the stereo equipment, Alto went to a neighbor's house to call a cab. A cab driven by an acquaintance of Alto, John Curkendall, responded to the call, drove Alto to a downtown address, and subsequently took him to the Elbow Room where Alto was delivered without paying his fare.

In the meantime, the Anchorage police department became aware of the homicide at the Royal residence and contacted Frank Norton for a description of Frank Alto. The police took Norton downtown to search for Alto and subsequently found Alto in the Malemute Bar. Alto was arrested that afternoon for the murder of Ms. Royal.

A criminal complaint was filed on August 7, 1973, and on August 9, 1973, a grand jury returned a six count indictment charging Alto with first degree murder, felony murder while attempting to perpetrate rape, felony murder while perpetrating a burglary, grand larceny, and two related burglary counts. The charge of felony murder while perpetrating a burglary and the two burglary counts were dismissed at trial. Before trial Alto presented notice of his intent to rely on a defense of mental disease or defect excluding responsibility, under AS 12.45.083.

Alto's trial commenced on March 26, 1974, before the Honorable C. J. Occhipinti, Judge of the Superior Court, sitting without a jury. During trial, the state presented the testimony of those who had observed Alto on the afternoon of the murder. In addition, the state presented the testimony of an FBI Agent, the victim's husband, criminal investigators for the Anchorage Police Department, and Dr. Donald Rogers, a pathologist. The testimony of witnesses for the state served mainly to establish the facts surrounding the killing according to each witnesses' contact with Alto on the day of the murder.

The principal defense witnesses were clinical psychologist Dr. Jon Burke and psychiatrist Dr. J. Ray Langdon. Dr. Burke concluded that Alto suffered from a "major mental disorder, namely psychosis." Dr. Langdon testified that Alto had suffered from "chronic undifferentiated schizophrenia" since at least August 6, 1972. It was his opinion that Alto's mental disease or defect prevented him from being able to conform his behavior to the requirements of the law.

The defense also presented the testimony of five lay witnesses including Alto's sister, who related two prior occasions when Alto appeared to have lost control; Ms. Barbara Giecometti, who related Alto's childhood difficulties; the Public Defender, Mr. Brian Shortell, and one of his legal interns, who found Alto's lack of responsiveness to their legal assistance to be unusual; and a fellow inmate, who related Alto's characterization of the murder as well as his own impressions of Alto whom he considered to be in need of psychiatric help.

The court found "nothing [in the testimony] that would indicate insanity." Further, it found Alto "responsible" and guilty of the charges of first degree murder, larceny, and rape. After hearing the recommendations of both the state and defense counsel on an appropriate sentence, Judge Occhipinti sentenced Alto to sixty years with a mandatory one-third to serve before eligibility of parole. This appeal followed.

I

Appellant's first claim of error can be quickly disposed of. The state, in its brief,

concedes that there was error and that the rape conviction must be set aside.

██ Alto was never charged with rape, a fact that was called to the attention of the trial court by both the prosecution and the defense. The only mention of rape in the indictment under which Alto was tried appears in Count III, charging him with the crime of murder committed "in the attempt to perpetrate a rape." Such language utterly fails to allege the separate crime of rape with sufficient clarity to support the conviction. Nothing is more fundamental to our system of justice than the requirement that the accused be informed of the charges against him.[4] Thus, Alto's rape conviction must be vacated.

## II

Alto's defense to the charges of murder and larceny was based upon AS 12.45.-083(a). That section provides:

A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

██ In this state, as well as in every other, a defendant in a criminal action may raise the defense that he or she was "insane" at the time of the criminal conduct and cannot therefore be held responsible for his or her actions. The determination of that insanity has been a much disputed medical, psychological, psychiatric and legal problem. Until 1972, Alaska used a version of the historic *M'Naghten* Rule. That test, then the primary test of criminal responsibility in the United States,[5] essentially required that:

"[T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the

mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know he was doing what was wrong." 10 Cl. & Fin. at 210, 8 Eng. Rep. at 722, cited in *Pope v. State,* 478 P.2d 801, 808 (Alaska 1970) (dissenting opinion).

This court, in *Schade v. State,* 512 P.2d 907 (Alaska 1973) abandoned the *M'Naghten* Rule and adopted a new test following the enactment of AS 12.45.083. The new test is almost identical to the one developed by the American Law Institute (ALI). *Schade, supra* n.4. In his oral pronouncement of judgment, Judge Occhipinti employed this basic test in seeking to determine Frank Alto's responsibility for his actions.

. . . I've also checked the statute which pretty much spells out the words of the ALI test which our state has adopted and I think counsel both would agree that the conduct that the court must find as the result of a mental disease or defect, the defendant substantially—or lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. I think this is—basically we're in agreement with that.

Indeed, both sides seemed to be in agreement with the basic test as there was no point to that effect raised on appeal. The problems that are raised on appeal deal with the application of this defense.

Alto contends that his conviction of first degree murder and larceny must be reversed because of the evidence of mental disease or defect. Particularly, Alto argues that the superior court failed to apply the proper test in determining whether a defendant has introduced evidence of his mental disease or defect excluding criminal responsibility sufficient to place upon the state the burden of proving criminal responsibility beyond a reasonable doubt.

---

4. Art. I, sec. 11 of the Constitution of the State of Alaska provides, in part:

The accused is entitled to be informed of the nature and cause of the accusation . . . .

5. Wiehofen, *Mental Disorder as a Criminal Defense,* 51, 68 (1954).

Alto further argues that even if the court did apply the proper test, the conviction must be reversed because it is not supported by sufficient evidence.

## BURDEN OF PROOF

■ The legislature's enactment of AS 12.45.083 not only resulted in a change in the basic test for insanity, but also resulted in substantial changes in the law governing the burden of proof. Formerly, in Alaska, if a defendant asserted insanity, the defendant was required to affirmatively establish it "by a preponderance of the evidence." *Chase v. State,* 369 P.2d 997, 1003 (Alaska 1962).

Today, AS 12.45.083(b) provides:

Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.

In *Dolchok v. State,* 519 P.2d 457, 458 (Alaska 1974) this court explained the meaning of AS 12.45.083(b) as follows:

Subdivision (b) means that once evidence of insanity is introduced, the burden is on the state to prove sanity beyond a reasonable doubt. (footnote omitted)

Clearly then, the defendant who raises the defense of mental disease or defect is no longer required to establish his defense by a preponderance of the evidence.

In this case, it is unclear whether the trial judge found: (1) that there was an insufficient amount of evidence regarding Alto's insanity introduced to trigger the state's burden of proving his sanity beyond a reasonable doubt, or (2) that sufficient evidence of Alto's insanity was introduced to raise the issue, but the state's consequential burden of proving him sane beyond a reasonable doubt was met. A conclusion that the superior court found no evidence of

mental disease or defect sufficient to trigger the state's burden of disproving the defense beyond a reasonable doubt is supported by the trial court's oral findings of fact and conclusions of law. The court apparently found that the testimony of the lay witnesses, including that regarding Alto's insomnia or uncontrollable rages, did not raise the issue of insanity.

THE COURT: It's a question of rage and I've taken into consideration the entire background of the defendant, the rejection that apparently he felt, the undisciplined surroundings and environment he was raised in, the hatred he probably showed for his mother and parents and how he struck back at society at certain times because of this and with alcohol, it was substantially aggravated, but I find nothing wrong with it as far as raising any doubt or raising any question as to his sanity.

The trial court further concluded that the expert testimony of the psychiatrists was also insufficient to properly raise the issue of insanity and place the burden of proof on the state.

The testimony as to the smiles or—when there was no humor which apparently Dr. Langdon made quite a big to do about, puzzled me because I know of a judge on the bench here who, when he was very angry, smiled and at that time when I was practicing law, I knew I'd better sit down. So, I think this of itself means nothing. I think that's a nervous—or an attempt perhaps at explaining something or saying something that—and trying to mask the obvious buildup of anger that's accumulating. Dr. Burke shows nothing from his factual testimony that would indicate mental disease. His tests, MMPI and Rorschach and all, certainly don't support his conclusion in the least. As a matter of fact, his testimony I think was very contradictory from a factual standpoint based on what he referred to. And I also reject Dr. Langdon's testimony in that area. His conclusions, although very strong, are certainly not founded in the testimony that I have.

. . . . .

[T]here's nothing to indicate insanity . . . [s]o I find the defendant responsible.

Finally, at the time of sentencing, the court stated:

> [A]s far as any signs of mental disease, there were none. In the opinion of this court, there were none found. *There were none testified to.* . . . Now, there is no psychotic evidence . . . . (emphasis added)

■ By evaluating the credibility and persuasiveness of the experts' testimony in determining whether the defendant had properly raised the issue of insanity, the trial court was in effect employing the old standard of requiring the defendant to prove his insanity by a preponderance of the evidence.[6] However, according to AS 12.45.083(b), the burden of affirmatively proving insanity is not on the defendant. His duty is to introduce evidence supporting this defense; it is the state's burden to then prove that he is sane beyond a reasonable doubt. AS 12.45.083(b); *Dolchok v. State, supra.* Clearly then, the standard requiring a defendant, relying on the defense of mental disease or defect, to present evidence sufficient to convince the court of his insanity is an incorrect standard. Its employment places an undue burden on the defendant and is clearly erroneous. As the court in *Amador Beltran v. United States,* 302 F.2d 48, 52 (1st Cir. 1962) stated:

> The introduction of evidence of insanity places a burden on the government of proving sanity beyond a reasonable doubt. *Davis v. United States,* 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499. This burden cannot be spirited away by the simple method proposed by the government of the court's saying it does not believe the evidence, therefore, there is no evidence, therefore there is no burden. It should be apparent that such thinking

would render the whole principle meaningless.

■ Although we have never before articulated a definite legal standard regarding the quantum of evidence which must be adduced to trigger the state's burden to prove sanity, in the federal system, as well as in about one-half of the states,[7] the rule of law seems to be that "some" evidence of the defendant's insanity is sufficient. This rule accords with the thinking of Wigmore,[8] Wiehofen,[9] and Wright,[10] and we hereby adopt it.

■ Furthermore, in *Dolchok v. State, supra,* we held that testimony by experts that Dolchok was chronically mentally ill from a schizophrenic disorder and was unable to control the acting out of his impulses was "sufficient evidence of insanity to place on the state the burden of proving sanity beyond a reasonable doubt." 519 P.2d at 459. Given our conclusion in *Dolchok,* testimony by experts that Alto was psychotic, schizophrenic and was incapable of conforming his behavior to the requirement of the law certainly was sufficient to properly raise the issue of insanity.

### SUFFICIENCY OF THE STATE'S EVIDENCE

Appellant next contends that the state did not meet its burden of proving his sanity beyond a reasonable doubt.

He bases this argument in part on the contention that the state could not meet its burden of proof without presenting affirmative evidence of sanity—that it could not rely entirely on the cross-examination of appellant's expert witnesses.

---

**6.** Although we can conceive of situations in which the defendant's evidence of insanity may be so scant or lacking in credibility that the trial judge can find that it does not operate to trigger the state's burden of proving sanity, this was certainly not such a case. In Alto's case, the trial court attempted to weigh the credibility of expert testimony which was clearly sufficient to properly raise the issue of insanity and thus trigger the state's burden of proving Alto's sanity beyond a reasonable doubt.

**7.** *See* Justice Connor's dissent in *Pope v. State,* 478 P.2d 801 n.24 (Alaska 1971) and cases cited therein.

**8.** 9 Wigmore, *Evidence* § 2491 at 289 (1940).

**9.** Wiehofen, *Mental Disorder as a Criminal Defense,* at 216 (1954).

**10.** 2 Wright, *Federal Practice and Procedure,* § 403 at 67 (1969).

Appellant relies on *United States v. Cooper,* 465 F.2d 451 (1972), in which the Ninth Circuit held that the government may not meet its burden by solely discrediting defendant's expert testimony. The Court of Appeals viewed the government's burden as follows:

> The government cannot carry its burden by attacking the strength of Cooper's case. To meet its burden it must point to affirmative evidence which is adequate to prove sanity without the benefit of a sanity presumption. 465 F.2d at 455

However, in a subsequent case, the Ninth Circuit modified the holding in *Cooper.* In *United States v. Shackleford,* 494 F.2d 67, 70 (9th Cir. 1974), the court adopted Judge Wright's dissent in *Cooper* :

> Judge Wright, in his dissent in *Cooper,* correctly interpreted the law in this and other circuits when he stated, 'No rule of law requires the government to offer expert medical testimony in every case in which a defendant has a psychiatrist testify for him. The need for expert testimony depends upon the facts of the case.' *Cooper, supra,* 465 F.2d at 455. This was, in part, a quotation from our opinion in *United States v. Ingman,* 426 F.2d 973, 976 (9th Cir. 1970).

The *Shackleford* court went on to disassemble the notion that the state must adduce some form of affirmative evidence to satisfy its burden.

> We also said in *Ingman* : 'If a defendant raises the defense of insanity and offers evidence in its support, the presumption that every man is sane disappears. The prosecution then has the burden of proving the fact of sanity beyond a reasonable doubt.' * * * But '[t]he nature and quantum of evidence of sanity which the Government must produce to sustain its burden and take the case to the jury will vary in different cases.'

■ Thus, it seems clear from the *Shackleford* explanation of *Cooper* that there is no rule of law which requires that the prosecution adduce expert or lay testimony or other affirmative evidence to satisfy its burden of proving a defendant's sanity beyond a reasonable doubt. We hold accordingly.

Appellant's second contention is more troublesome. The question that this court is called upon to answer is the same one as was asked in *Dolchok, supra* : whether "there is substantial evidence to support the judge's finding as to appellant's responsibility for the crime he committed." [11]

> Substantial evidence is such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt appellant was sane when he killed the victim.[12]

In making this determination, "the evidence and inferences to be drawn from the evidence must be viewed in a light most favorable to the state." [13]

As noted earlier, the defense relied upon the testimony of Dr. Jon Burke, a clinical psychologist, and five lay witnesses. The state presented no psychiatric evidence nor lay or expert testimony to rebut the contentions made by the defense's witnesses but merely relied on their cross-examination.

In order to make a determination of the existence of sufficient evidence to find Frank Alto sane beyond a reasonable doubt and therefore guilty, a review of the following testimony in the light most favorable to the state is necessary.

The defense's first witness, fellow inmate John Schomer, testified that Alto acted "speeded up" in jail and that he was constantly joking around. Schomer stated that Alto looked like a person who "wasn't aware of what was going on . . . " and recalled the murder daily, sometimes "maybe more than once a day," sometimes laughing about it. Ultimately, Schomer suggested that Alto get psychiatric help, and Alto agreed that he needed it. The

11. 519 P.2d at 460.

12. *Id.,* citing *Beck v. State,* 408 P.2d 996, 997 (Alaska 1965).

13. *Id.,* citing *Johnson v. State,* 511 P.2d 118, 126 (Alaska 1973) and *Beck v. State,* 408 P.2d 996, 997 (Alaska 1965).

state cross-examined Schomer on his belief that anyone who kills must be mentally ill.

The defense's second lay witness was Brian Shortell, Public Defender. Shortell testified that Alto was non-responsive throughout his dealings with Shortell and that at a previous arraignment acted "unusual." Shortell thought Alto needed a psychiatric examination. Cross-examination merely pointed out that there might not be anything unusual about a nonresponsive client.

Arthur Robinson, the defense's third lay witness and an intern for the public defender's office at the time, testified that he, too, thought Alto was unusual. From his two interviews with Alto in jail, Robinson related that Alto sat in the corner of the large interview room in a yoga position while being interviewed; his conversation was somewhat incoherent; he constantly laughed and smiled nervously and said that he didn't want to live anymore. Cross-examination revealed that previous to the interviews Robinson had been told that Alto drank heavily on the weekend before the murder, Alto experienced blank spells during which he didn't know what was going on, and that he often complained of headaches.

The defense's fourth lay witness, Alto's sister, related a fight between Alto and her husband in Egegik in 1972. Mid-way through the fight, the husband had wrestled Alto to the floor where he was planning to hold him while waiting for the State Troopers. Alto's sister testified that Alto's face was "glassy", he was "foaming at the mouth," and that she thought he had gone "berserk." She further stated that he was jumping around as if "he was winding up for something; it was like a bomb about ready to—to go off."

Alto's sister related a similar incident that occurred in a bar in Summit later 1972. One afternoon, after buying everyone in his party a drink, Alto became involved in a dispute with the bartender.

> . . . I don't think it was 5 minutes after he bought us that drink and was in a happy mood when all of a sudden, we heard this shouting and hollering and my dad and I looked up and—and Frank was talking and saying [to the bartender] that I want my jacket, I want my jacket and he was in that mood, the one where I say that his eyes get glassy and he was kinda hoppy, you know, and . . . the next minute they were fighting. . . .

The testimony reveals that Alto had never brought his jacket into the bar.

Alto's sister further testified to their family life in Egegik where their mother drank heavily, their parents quarreled a great deal, and where their father was rarely home. Alto's mother used to say repeatedly, "Frank, you're crazy." According to the witness, she seemed to realize that he needed help. Cross-examination elicited testimony that tied most of Alto's actions to his excessive drinking, pointing out the periods of relative calm and responsibility that the witness had observed in her brother when he was not drinking. The attempted inference by the state is clear: Alto acted out of control in these two particular situations after he had been drinking for several hours.

Barbara Giecometti, the defense's final lay witness and good friend of the Altos in Egegik, testified about the miserable family life that Alto experienced as a boy in Egegik, corroborating what Alto's sister related. It was Ms. Giecometti's opinion that Frank Alto should have had mental health care years ago since "he was subject to retardedness." Cross-examination was employed to relate Alto's attitude to his poor family life and to establish Alto's familiarity with knives through the fact that the entire village fished.

Drs. Jon Burke and J. Ray Langdon were the mainstay of the defense's case, and they testified for one-half day each. Both qualified as expert witnesses. Dr. Jon Burke is a clinical psychologist at the Langdon clinic who, as of the time of trial, had performed 500–700 evaluations.

Dr. Burke examined Alto on August 30, 1973, and again on April 18, 1974. On each occasion he administered four tests: Minne-

sota Multiphasic Personality Inventory (MMPI),[14] Wechsler Adult Intelligence Scale (WAIS), Graham Kendal Memory for Designs Test and Gray's Oral Reading Test. He also administered two techniques[15] at each session: Thematic Apperception and Rorschach.

Dr. Burke's reading of the graph plotted by Alto's answers to the 566 questions on the MMPI showed that it was "consistent with a finding of a major mental disorder, psychosis." The Rorschach, revealed "a psychotic disturbance, frequently schizophrenia." The responses to the second Rorschach testing in April 1974 confirmed Dr. Burke's earlier observation.

> Mr. Alto does not have available to him all of the time or even most of the time adequate thinking and rational processes to make decisions and to guide many elements of his own behavior.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> There's some reason to assume that a major mental illness of this proportion is something that transcends large and long periods of time. . . . And in making my report to this court, I was assuming that the severe mental condition preexisted long before the commission of the crime.

Based on these tests and techniques, Dr. Burke was asked by counsel for defendant for his conclusions.

Q. Based on those 3 examin—those 3 protocols, did you—were you able to come to any conclusion and form any opinion as to Mr. Alto's mental stability, whether or not he—form any opinion as to whether or not he is suffering from mental disease or defect?

A. Based on the MMPI which is—relies heavily on various statistics and mathe-matical formulations and so forth, and also the quality and character or responses to the Rroschach and to a lesser extent the Thematic Apperception test, I would conclude that Mr. Alto does suffer from major mental dis—defect, major mental disorder.

Q. By major mental, what do you mean?

A. I would say that it would be certainly of psychotic proportions and it's certainly psychosis.

Q. Were you able to determine anything of the nature of that illness, that is not the name, but the way the—the way it functioned?

A. Well, again relying on the Rorschach responses . . . and again based on a review of the literature of similar kinds of patterns of responses, my opinion would be that from time to time when confronted with highly emotionally charged situations, Mr. Alto would lose much if not all capacity to respond in any rational manner but instead have his responses for the most part guided by internal emotional needs and those kinds of things. But at any rate, whatever the response would be in those circumstances, it would be free of any associati—associative or rational thought processes.

Q. By rational thought processes are you equating that with control?

A. Yes.

Upon cross-examination, counsel for the state pointed out that the basic manual that Dr. Burke used to interpret the results of the MMPI was not used by the head of the Alaska Division of Mental Health, Dr. Ferreze; in fact, the state implied that Dr. Ferreze would probably have read Alto's MMPI differently. The state also questioned Dr. Burke with respect to the results

---

**14.** The MMPI is a test which assesses different levels of personality functions as well as assessing the presence or absence of psycho pathology. The Rorschach, otherwise known as the "ink blot" test is a test in which a patient examines 10 ink blots and makes a response to them, i. e., what they look like to him, what they remind the patient of, and what the patient sees in them. It is particularly useful to "distinguish between patients who suffer a major mental illness and those that do not." The Thematic Apperception test is one in which the patient is presented with a card with pictures and asked to make up a brief story regarding what happened before the picture, during the picture and after the picture.

**15.** A technique differs from a test in that it doesn't carry the kind of statistical reliability and validity that a test does.

of the MMPI which indicated Alto was near the borderline in his ability to exercise self-control.

When asked about the schizoid reaction registered by Alto, Dr. Burke admitted that it was possibly in remission at the time of the murder, stating that the computer's reading of the situation was guesswork. The inference the state was obviously trying to draw was that the computer's interpretation of all of Alto's responses to the MMPI, upon which Dr. Burke based his own conclusions, was imprecise and speculative. When Dr. Burke was questioned about the efficiency of the tests administered, Burke admitted to their ambiguity and imprecision.

Dr. J. Ray Langdon, a psychiatrist at and director of the Langdon Psychiatric Clinic, also testified as to Frank Alto's mental condition.

Dr. Langdon examined Alto pursuant to a court order in August 1973 and in April 1974. Upon his initial interview with Alto in August, it was Dr. Langdon's opinion that:

> The dissociated emotional response and the jumbled thought pattern . . . indicative of schizophrenia and rather than any specific type such as paranoia, it seemed a little more like a chronic undifferentiated type of schizophrenia.[16]
>
> \* \* \* \* \* \*
>
> [I]n my opinion it was probably in existence August 6, 1972 as well as 1973.

Dr. Langdon was asked his opinion as to Alto's mental condition and its ramifications.

Q. [C]ould you form an opinion as to whether or not the mental disease or defect caused in Frank a lack of substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law at the time that he at least had intercourse with, killed Mrs.—the decedent in this case and subsequently took several items from that house?

A. I do have an opinion and . . .

Q. And . . .

A. . . . and it's my opinion that this disease did prevent him from being able to conform his behavior and it's based not strictly on examination at the time it was happening because I wasn't there, but based on what I could discover from these documents and from this condition when I did examine him.

Q. Could you go into what the basis of the opinion is?

\* \* \* \* \* \*

A. [F]inding him in the condition that I did when I examined him, with this type of illness would indicate that the illness is operative in my opinion practically all the time. The behavior at one—from time-to-time is governed by impulses of the moment and therefore is fairly unpredictable and I would assume that perhaps his behavior or his impulsivity is made worse at times when he is drinking alcohol or when some minor frustration to him becomes a major impulse boulder. So that even though he is not always killing someone, I think he's always psychotic.

---

**16.** In his testimony, Dr. Langdon explained what "chronic", "undifferentiated" and "schizophrenia" meant.

> A. The—term chronic indicates usually that it has gone on a long time and that it's expected to go on for a long time as opposed to an acute situation where a person may be going along and appearing very normal and then become acutely psychotic and delusional and hallucinating. And differentiated means that as I said there, the differentiated types of schizophrenia are called paranoid, catatonic, hebephrenic and he doesn't fit exactly into any one of these. He's more undifferentiated. He's got bits and pieces of this and that, which usually indicates that a person has had the disease process for quite a while and it's sort of deteriorated.
>
> Q. And the schizophrenia?
>
> A. Yes.
>
> Q. That's the next word. . . .
>
> \* \* \* \* \* \*
>
> A. Well, the word schizophrenia does not mean split personality. The original coinage of the term was to indicate a split from reality meaning that a person suffering from this type of thing is unable to perceive reality in the usual way that other people do, not—not any other people, but all other people, and that his thinking and emotional processes are—are disturbed.

Dr. Langdon examined Alto again in April, 1974, shortly before trial, and found essentially the same things he found in August, 1973. Dr. Langdon was asked if his findings were consistent with the type of killing for which Alto was accused. Dr. Langdon characterized the killing as "unusual" and went on to say:

> This type of over kill and type of a ritual apparently—sort of knife wounds are not indicative of the ordinary way of killing a person just to have them dead. But it would seem to indicate that the impulses got wildly out of control and that all sorts of things were going on in his head to bring about this type of thing.

Each of the incidents which the lay witnesses described were again described to determine if these reactions were consistent with Dr. Langdon's characterization of Alto. In each instance, the answer was in the affirmative.

On cross-examination, Dr. Langdon contradicted some of the MMPI findings. Furthermore, the state suggested that the time Dr. Langdon spent with Alto was insufficient upon which to base such an extensive report and in particular, referred to a remark made by Dr. Ferreze, head of the Alaska Mental Health Division where he said that "a 45-minute to an hour over-the-counter interview with a subject such as Mr. Alto and a person in [Dr. Langdon's] role as a psychiatrist is utterly worthless." Dr. Langdon disputed the suggestion.

### FINDING OF THE COURT

It was the finding of the trial court that the expert and lay testimony that was given for the defense failed to establish a reasonable doubt as to the appellant's sanity.

The court said, in particular:

> Certainly the testimony of Schomer is contradicted by the M.M.P.I. itself where Schomer says the defendant would knock off to sleep and wake up happy. This shows that he was restless and had sleepless nights and there's a lot of contradiction. The testimony of Alto's sister . . . did point out exactly what

came through to me very strongly that there was very definite rage and anger perhaps coupled with alcohol which caused this behavior. So, I don't think that in any way would raise any reasonable doubt or question of sanity. It's a question of rage and I've taken into consideration the entire background of the defendant, the rejection that apparently he felt, the undisciplined surroundings and environment he was raised in, the hatred he probably showed his mother and parents and how he struck back at society at certain times because of this and with alcohol, it was substantially aggravated, but I find nothing wrong with it as far as raising any doubt or raising any question as to his sanity. . . .

Dr. Burke shows nothing from his factual testimony that would indicate mental disease. His tests M.M.P.I. and Rorschach and all certainly don't support his conclusion in the least. As a matter of fact, his testimony I think was very contradictory from a factual standpoint based on what he referred to. And I also reject Dr. Langdon's testimony in that area. His conclusions, although very strong, are not founded in the testimony that I have. Speech rambling might give someone some indication of maybe something wrong, but certainly when there's testimony that we have a person of a—at the top of the dull range in the intellect, there is some rambling normally . . . and I think the thing that apparently impressed Dr. Langdon and Dr. Burke so much was a (sic) at the pictures and the crime committed. He must be crazy. Carving that out and looking at the entire bit of testimony that I've had today—or this—during this period of time, if we took that incident away and found ourselves in this courtroom trying to put Mr. Alto away as being insane, I—and I would even tend to hold that—assuming that all of the other testimony, leaving out the crime, were brought before me, I'd probably be laughed out of town because there's nothing that would indicate insanity. Certainly bizarre behavior, cer-

tainly hostility, certainly anger, certainly striking out, but nothing would indicate insanity. But the concluding thing is that he did this so he must be crazy and the doctors were apparently impressed, not by the facts, but of this crime. So, I find the defendant responsible and I find him guilty of first degree murder. I find him guilty of larceny. When you look at the pictures in the account of it, certainly this young man knew what he was doing, carefully did it, it wasn't a very bizarre slicing or anything else. It was a very punctuated within a certain area for a certain purpose.

 Our review of the entire record leaves us with the firm conviction that Judge Occhipinti was clearly mistaken in finding Alto sane, and therefore guilty of larceny and murder, beyond a reasonable doubt. The evidence, we believe, established that the state had failed to maintain its burden of proving sanity beyond a reasonable doubt as a matter of law. It is our view that reasonable men could reach but one conclusion in this case, namely that a reasonable doubt existed concerning whether or not Alto possessed substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, as a result of mental disease or defect. Such being the case, acquittal was required by AS 12.45.-083(a). Alto's convictions for larceny and murder must therefore be reversed.[17]

 Upon remand the superior court shall enter judgment finding Alto not guilty of the crimes charged, by reason of mental disease or defect.[18] However, the trial court's responsibility will not end there.

The same evidence that established a reasonable doubt concerning Alto's sanity strongly suggests that he may constitute a very real and continuing threat to society. AS 12.45.090 provides:

If the jury [or judge sitting without a jury] finds the defendant not guilty on the ground of mental disease or defect and the court considers his being at large dangerous to the public peace or safety, the court shall order him to be committed to an institution authorized by the commissioner of health and social services to receive that person and held in custody until the disease is cured or the defect corrected or he is otherwise discharged from the institution by authority of law.

Upon remand the superior court shall review the record together with such additional evidence as it may consider proper, to determine whether additional commitment and treatment is required under the foregoing section. Thereafter, the court shall enter such further orders as appear just and proper.

Such further proceedings shall be commenced within 60 days after the superior court's receipt of our mandate in this case. Pending further action by the superior court, appellant shall remain in custody for such 60 day period, provided however, that unless further commitment proceedings under the authority of AS 12.45.090 are initiated within such 60 day period, appellant shall thereupon be released.[19]

**17.** In reaching this conclusion, we do not accept appellant's contention that as a matter of law the trial judge was bound by the expert medical testimony. This jurisdiction, along with many others, has refused to adopt a rule which would treat medical testimony as conclusive merely because it is not disputed by other medical testimony. In *Bowker v. State*, 373 P.2d 500, 501 (Alaska 1962), we said:

The jury should be free to make an independent analysis of the facts on which the expert's opinion rests, and thus exercise their historic function of passing on the credibility of the witness. 373 P.2d at 501–02.

In this case, the trial judge served the function of trier of act and the criterion of how he should proceed in analyzing the expert testimony should be no different than provided for a jury sitting as the trier of fact.

**18.** *See* AS 12.45.083(c), which provides:

If the defendant is acquitted on the ground of mental disease or defect excluding responsibility, the verdict and the judgment shall so state.

**19.** This disposition is similar to the action recently taken by the United States Supreme Court in *Brewer v. Williams*, ——— U.S. ———, ——— – ——— n. 12, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In that case, the court, after upholding the lower court's reversal of the murder convic-

REVERSED and REMANDED for further proceedings consistent with this opinion.

tion of an escaped mental patient on constitutional grounds, suspended the issuance of a writ of habeas corpus for 60 days and ordered that the defendant remain in custody for that amount of time to allow the state an opportunity to initiate a new trial.