**Andrew D. DOLCHOK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1828.**

Supreme Court of Alaska.

March 8, 1974.

R. Collin Middleton, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., Stephen G. Dunning, Asst. Dist. Atty., Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, ERWIN and BOOCHEVER, JJ., and DIMOND, J. Pro Tem.

DIMOND, Justice Pro Tem.

The appellant, Andrew Dolchok, killed and robbed Harry Hibbs, a cab driver. He was tried by the superior court without a jury, found guilty of first degree murder and sentenced to life imprisonment. On this appeal, he contends that the trial court ought to have found him not guilty by reason of insanity.

Legal insanity, as a defense to the commission of a crime, is couched in terms of lack of responsibility for criminal conduct as a result of a mental disease or defect. AS 12.45.083 provides in part:

(a) A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(b) Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.

Subdivision (b) means that once evidence of insanity is introduced, the burden is on the state to prove sanity beyond a reasonable doubt.[1] Since there was evidence of insanity in this case, the ultimate question is whether the state sustained its burden of proof.

Appellant made a written statement or confession which was introduced without objection. He stated that he had hired the cab driver, Hibbs, to take him to Eagle River. When they arrived in that area, appellant pulled out a .32 caliber pistol which he had stolen earlier in the day. Hibbs begged appellant not to shoot him and told appellant that he could have his money and the taxicab. Hibbs at first tried to escape by running, but was stopped by appellant and forced to put all of his money on the cab. Hibbs tried to disarm appellant, and appellant shot him in the chest. Appellant's account of what then occurred is as follows:

I went over and he said, "You shot me once", and started to beg me not to shoot him again. Kept on saying that he had a family to support. I told him, I said, "You disobeyed all my orders that I gave you." I told him, "Why didn't you obey what I said?" He said, "Please don't shoot me no more." I watched him for about five minutes trying to get up. Then I squatted down next to him. I told him, I said, "You are standing before the Judge, Jury and Prosecutor." I said, "Since you disobeyed all my orders, I find you guilty and I sentence you to death." He said, "Please, you shot me once, don't shoot me again." Then I shot him in the head. I watched him for about fifteen to twenty minutes.

Appellant tried to conceal the cab and remove his fingerprints. He walked to the camp of a friend and tried, without success, to get some horses to go into the bush for a few days. He then walked to Palmer, checked into a hotel, went drinking with friends, and persuaded a teenage girl to share his room for the night in return for $40. The next day he went to Fairbanks, was arrested for forgery, released on his own recognizance, and was later arrested for stealing a car. By that time, the investigation into Hibbs' death led to appellant and he was arrested for murder.

Appellant's account of events that took place prior to the killing indicate that during the day he had been drinking a considerable amount of alcohol. He stated that he stole a pistol from a parked car. He forced a thirteen or fourteen year old girl to engage in sexual relations in the back seat of another car, and followed this by bumming drinks from people in downtown Anchorage. At about one o'clock in the afterooon, he said that his head "went into a buzz" and that he tried to communicate with other people, "but they just kept shining me on."

1. Johnson v. State, 511 P.2d 118, 126–127 (Alaska 1973).

He asked another cab driver for some money and was told to "get lost." He was kicked out of a bar because he couldn't pay for the drinks he had ordered. He then went looking for a prostitute, stating that, "[M]y intentions were to kill." He found a prostitute, but she rejected him because he had no money. He did her no harm. Appellant stated: "Then I had a hate for everybody." He went back to the bar from which he had previously been ejected, and was again kicked out. It was after this that he hired Hibbs to take him to Eagle River.

These events are related in some detail because they have a bearing on the evidence of insanity that was presented, and the trial judge's conclusion that, in spite of such evidence, sanity had been established beyond a reasonable doubt and appellant was criminally responsible for the killing.

■ The evidence supporting the defense of insanity came principally from the testimony of Dr. Langdon, a psychiatrist. Based upon the events related by appellant, upon appellant's past history, and upon what Dr. Langdon termed the "full diagnosis" of appellant, it was the doctor's opinion that appellant was chronically mentally ill from a schizophrenic disorder. The doctor was asked by defense counsel, in the words of the statute, whether as a result of such mental disease appellant lacked the substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law. Dr. Langdon responded:

> That was my opinion; that he was able to understand the nature or the wrongfulness of his conduct, but that because of the illness he was not able to conform his behavior inasmuch as he didn't agree with the general idea of the wrongfulness of it as applied to himself.

In addition to this expert testimony, a psychologist, Dr. Jon Burke, testified that from the results of psychological tests given to appellant, it was his opinion that, at the time of the tests, appellant was suffering from a major mental illness, and that

the results of the tests suggested the "inability really to control the acting out of his impulses." Finally, there was placed in evidence a written report of Dr. Rader, another psychiatrist. He found appellant "chronically ill," but did not offer an opinion as to whether he was legally insane at the time of the killing. Counsel for the state apparently conceded that had Dr. Rader been called to testify he would not have disagreed with Dr. Langdon's conclusions.

Dr. Langdon's testimony was sufficient evidence of insanity to place on the state the burden of proving sanity beyond a reasonable doubt. Appellant contends there was absolutely no evidence tending to show that he was not insane when the killing took place, and therefore that the state failed to meet its burden of proof.

Relying on the evidence of appellant's behavior as related in detail in his confession, the trial judge disagreed with appellant's position and found that he was not insane when he shot and killed the cab driver. In reviewing the evidence, the judge was influenced by the fact that prior to the killing appellant did control his emotions when he was refused drinks and thrown out of a bar, when his request for money from another cab driver was rejected, and when he was turned down by a prostitute. He controlled his behavior until he got the cab driver, Hibbs, off into a remote area where he took Hibbs' money and then killed him. He was in sufficient command of his mental faculties, after the killing, to attempt to hide the cab and Hibbs' body and wipe away his fingerprints. As the judge stated in reaching the conclusion that appellant was not insane at the time of the killing:

> [T]he only conclusion I believe a reasonable man could draw, is the fact that this man was unable to get money, he thought the cab driver had some, he enticed him away from Anchorage with the purpose of robbing him, he did in fact rob him, and when the cab driver resisted he shot him; and then he hid the cab driver's body, took the cab, drove away,

finally disabled the cab, and hid it. This appears to be nothing except the mentality of a confirmed criminal rather than a man who is unable to control his emotions and adhere to rules of society because of a mental defect or disease. The evidence is overwhelming that he controlled his thwarted emotions for everything that he wanted until such time as he got this man through subterfuge out in an isolated area where he had the advantage because he had a pistol and killed him in perpetrating a robbery that he had planned before he left Anchorage in the cab.

■■ The question we are called upon to decide is whether the judge was mistaken in finding that appellant's sanity was established beyond a reasonable doubt. In determining this question, the evidence and inferences to be drawn from the evidence must be viewed in a light most favorable to the state.[2] The issue, then, is whether there is substantial evidence to support the judge's finding as to appellant's responsibility for the crime he committed. Substantial evidence is such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt appellant was sane when he killed his victim.[3]

■ A rather detailed profile of appellant's life history, emotional reaction patterns, and personality difficulties was given by Dr. Langdon, Dr. Burke and Dr. Rader. From a reading of this psychiatric evidence, and of the entire record, there emerges a picture of a man who is to some degree mentally disturbed. He may well have schizoid or schizophrenic symptomatology, as Dr. Langdon testfied. But the ultimate question for the judge to decide was whether the schizophrenic aspect of appellant's personality substantially incapacitated him from conforming his conduct to law. The judge found that it did not,

and we believe there was substantial evidence to support this finding.

Dr. Langdon commented on appellant's ability to control his conduct before and after the shooting. He said:

[H]e had stopped himself from doing certain things earlier. He'd run out of stops, I guess. . . . Now, a certain number of controls after the shooting came back again, probably because of the discharge of emotion.

What Dr. Langdon seems to be saying is that despite appellant's mental illness, he had the ability to control his actions—in the face of adversity—up to the time of the shooting, that at that moment he suddenly lacked the capacity to control himself, but that as soon as the shooting was over he regained his self-control.

The facts and logical inferences from them, which must be viewed in a light most favorable to the State,[4] were such as to permit the judge to find that appellant was able to control his actions, not only before and after the shooting, but at the time of the shooting as well. The very nature of the crime is consistent with a premeditated killing. In luring the cab driver to an isolated area for the purpose of robbery, it could be inferred that appellant considered it necessary to kill him in order to escape discovery. On the other hand, appellant might have been willing to rob Hibbs and leave him unharmed until such time as Hibbs tried to disarm appellant. Here it could be inferred that appellant had control of himself and only fired the first time when it became necessary in order to accomplish the robbery. Then appellant considered it necessary to fire the second and fatal shot in order to prevent identification. Either of these conclusions supports the trial judge's findings that appellant had substantial capacity to conform his conduct to the requirements of law.

2. Johnson v. State, 511 P.2d 118, 126 (Alaska 1973),; Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

3. Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

4. Johnson v. State, 511 P.2d 118, 126 (Alaska 1973); Beck v. State, 408 P.2d 996, 997 (Alaska 1965).

Dr. Langdon also stated that appellant was able to understand the nature or wrongfulness of his conduct, but that because of the illness "he was not able to conform his behavior inasmuch as he didn't agree with the general idea of the wrongfulness of it as applied to himself." Dr. Langdon also said: "[H]e has a recognition that it's a bad thing to happen from the point of view of other people. He hasn't—isn't convinced that it's a bad thing for him to do except as somebody may object to it."

It could be reasonably inferred from these statements that appellant knew what he was doing and that it was wrong, but that he had no feeling for the wrongfulness of his act because he was amoral. It was not the purpose of the statute governing insanity in criminal cases to exculpate from criminal responsibility those persons who, because they lack ethical sense, engage in criminal conduct. Such a lack of acceptance of basic moral concepts is not the equivalent of an inability, as a result of mental disease or defect, to conform one's conduct to the requirements of law.

When viewed in this light, the detailed series of events as shown by the evidentiary context of the killing, particularly as related by appellant, points to a man who, although mentally disturbed, had substantial capacity to control his behavior. This conclusion is confirmed by logical inferences arising from the testimony of Dr. Langdon. In these circumstances we find substantial evidence to support the conclusion of the trial judge that there was no reasonable doubt that appellant, despite his mental illness, was substantially capable of appreciating the wrongfulness of his conduct and conforming his conduct to the requirements of law.

■ Appellant's final argument is that the trial judge used the insanity test incorrectly. In his memorandum decision, the judge quoted the statute in full. In discussing the case and in reaching the conclusion that appellant was sane, the judge referred several times to appellant's ability

or inability to control his emotions or conform his conduct to the requirements of law. However, he did not refer, in this respect, to the statutory requirement that the inability or incapacity need only be "substantial." From this appellant contends that the judge imposed a stricter requirement—i. e., that before one could be acquitted by reason of insanity, his lack of capacity to conform to the law must be of a greater degree than just substantial.

Appellant's contention is without merit. The judge weighed the psychiatric testimony in light of the facts on which the opinions were based, and in light of facts which reason and common sense and the experience of mankind dictate. After doing this, the judge rejected in part the psychiatric opinion as not being supported by the facts. This means that the judge determined appellant simply was not incapacitated, regardless of degree, from conforming his conduct to the requirements of law. The judge did not require that the incapacity be total, rather than just substantial, in order to exculpate one from responsibility for criminal conduct.

The judgment of conviction is affirmed.