**Allen J. SMITH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4228.**

Supreme Court of Alaska.

July 11, 1980.

Virginia A. Rusch, Branson & Guetschow, Anchorage, for appellant.

Charles W. Cohen, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and MATTHEWS, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Chief Justice.

On September 28, 1977, Allen J. Smith, an army private at Fort Richardson, commandeered a vehicle at gunpoint, left the base and after being chased by the police shot and seriously wounded judicial services officer Leon Jordan. He was charged with shooting with intent to kill, wound, or maim.[1] At a court trial, he claimed he was not guilty by reason of insanity, and did not substantially challenge the testimony as to the shooting and his actions that day. Evidence from two psychiatrists and one clinical psychologist was not in agreement as to whether he was legally sane when he shot Jordan. He was found by the superior court to be sane beyond a reasonable doubt, and guilty of the offense. The court sentenced Smith to fifteen years imprisonment with five years suspended.

On appeal, Smith alleges that the superior court lacked sufficient evidence to find him sane beyond a reasonable doubt and that his sentence was excessive. We affirm both the conviction and the sentence.

Prior to a consideration of these issues, a review of the underlying facts is necessary. Two days before the shooting, Smith purchased the firearm he used, a Colt Commander 9 millimeter pistol. On September 28, Smith was told that he was being processed out of the service on a Chapter 13 discharge as an undesirable. Captain Tucker described Smith as a very apathetic, nonaggressive soldier, who did what he was told most of the time. He had been cited for various disciplinary problems and eventually it was decided that he should be

1. At the time of the offense, AS 11.15.150 provided:

Shooting, stabbing or cutting with intent to kill, wound or maim. A person who maliciously shoots, stabs, cuts or shoots at another person with intent to kill, wound, or maim him is punishable by imprisonment in the penitentiary for not more than 20 years nor less than one year.

This statute has since been repealed as part of the comprehensive Criminal Code Revision, Ch. 166, SLA 1978, effective January 1, 1980. The underlying facts of this offense would probably now be charged under AS 11.41.200, which provides:

Assault in the first degree. (a) A person commits the crime of assault in the first degree if

(1) with intent to cause serious physical injury to another person, he causes physical injury to any person by means of a dangerous instrument;

(2) with intent to cause serious physical injury to another person, he causes serious physical injury to any person; or

(3) he intentionally performs an act that results in serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life.

(b) Assault in the first degree is a class A felony.

separated from the army. He had been sent to the mental health clinic since he seemed to be continually "spaced out" and "was never actively involved or engrossed in what he was doing."

The testimony of Captain Tucker and other officers in Smith's battalion suggest that they had no knowledge of Smith's prior history of mental illness. Smith had previously been diagnosed as a paranoid schizophrenic. He was hospitalized twice, once in 1973 for approximately 3½ months and once in 1975 in two different facilities for approximately two weeks. The release report in 1975 suggested that no aggressive tendencies were present. His earlier 1973 hospitalization had occurred partly as a result of a violent incident resulting from a depression following the collapse of his marriage. He "jumped on a moving truck pulling off the driver, because he believed that the driver was his father-in-law."

After examination, the mental hygiene unit had originally sent Smith back finding no severe mental problems. When Smith exhibited continued unsatisfactory behavior, he was again sent to the mental hygiene unit. This time they recommended he be processed out of the army. Early on the morning of September 28, Captain Tucker informed Smith that he would be processed out of the military in approximately seven days. Smith showed no noticeable reaction to this information.

At 9:00 a. m., Smith entered the supply room at Fort Richardson and announced he was going to the airport. He pulled a gun and told platoon sergeant Wells that he needed a car. Wells did not have access to a vehicle, but told Smith he knew where a couple of sergeants were who might have one. Wells persuaded Smith to follow him into the bin room where one of the two sergeants present turned over to Smith the keys to his truck. Smith wanted Wells to drive him to the airport, but Wells refused. Keeping a gun trained on Wells and the sergeants, Smith backed out of the room and left with the keys to the pickup.

Smith got in the truck and headed toward downtown Anchorage. Gunfire was exchanged at the Fort Richardson gate. Smith proceeded westward toward the Seward Highway. A general police radio bulletin was issued on Smith, and his vehicle was spotted by several police vehicles. After the vehicle was pinpointed and followed by one police car, several others converged on the area. At that point, Smith accelerated to a high rate of speed and was pursued by several marked and unmarked police vehicles. Smith pulled over to the side of the road, jumped out of his vehicle and went running through a wooded area. One of the officers involved, judicial services officer Leon Jordan had gone around the block and was standing on the sidewalk. Jordan spotted Smith lying down behind a tree with his gun pointed at Jordan. Jordan yelled at him to freeze and tried to move out of the way. Smith fired twice, hitting Jordan in the chest and shoulder. Jordan got up, took several shots at Smith and hit him once. Jordan then collapsed to the ground and Smith was captured. Smith was found lying on the ground, bleeding from the leg.

Smith subsequently made two statements to the police. In both statements, he admits shooting Jordan. As part of his defense of insanity, Smith was examined by Drs. Robinson, Langdon and Rader. Robinson is a clinical psychologist while Langdon and Rader are both psychiatrists. All three agreed that Smith suffered from chronic schizophrenia. However, there was disagreement as to whether Smith's actions fell within the legal definition of insanity. All three agreed that Smith had substantial capacity to tell right from wrong. While Langdon and Robinson thought that Smith lacked capacity to conform his actions to society's norms, Rader concluded that Smith could.

 At trial, Smith's only defense was that he was innocent by reason of insanity. The relevant standard and the burden of proof are set forth in AS 12.45.083(a) and (b):

 (a) A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or

defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(b) Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct.

This court further explained the burden of proof requirement in *Dolchok v. State*, 519 P.2d 457, 458 (Alaska 1974):

Subdivision (b) means that once evidence of insanity is introduced, the burden is on the state to prove sanity beyond a reasonable doubt.[2]

The defense must come forth with "some evidence" supporting the defense of insanity before the burden of proof shifts to the

state.[3] The "some evidence" test requires that there be "more than a scintilla, but less than that which would compel a reasonable doubt as a matter of law."[4] In this case, although the court made no specific findings as to whether the defendant's initial burden was met,[5] the "some evidence" test clearly had been met. Smith presented the testimony of a psychiatrist and a clinical psychologist. Both stated that Smith's mental state came within the legal definition of insanity under AS 12.45.083(a), in that he lacked substantial capacity to conform his behavior to society's norms. The state has also conceded that the evidence presented was sufficient to raise the issue.

Thus, the question in this case is identical to that at issue in both *Alto v. State*, 565 P.2d 492, 498 (Alaska 1977) and *Dolchok v. State*, 519 P.2d 457 (Alaska 1974). In *Alto*, we noted:

Substantial evidence is such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt appellant

2. *Johnson v. State*, 511 P.2d 118, 126–27 (Alaska 1973) [footnote in original].

3. *Christie v. State*, 580 P.2d 310 (Alaska 1978).

4. *Id.* at 315.

5. The court's final decision was as follows:

I find that on or about the 28th day of September, 1977, at or near Anchorage in the third judicial district, State of Alaska, Allen J. Smith did unlawfully and maliciously shoot Leon T. Jordan with the intent to kill, wound and maim the said Leon T. Jordan. Further, I find that on September 28th, 1977, at the time the defendant shot Leon T. Jordan, the defendant while suffering from mental disease, had the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. I find the defendant guilty.

We are not aided in determining the substantiality of the evidence by any findings of fact or conclusions of law embodying the superior court's thinking as to whether either burden of proof had been met. In both *Alto v. State*, 565 P.2d 492, 502–3 (Alaska 1977) and *Dolchok v. State*, 519 P.2d 457, 459–60 (Alaska 1974), the two previous cases confronting this same issue, the trial court had left an ample record setting forth the basis upon which the court had reached their conclusions.

In *Alto v. State*, 565 P.2d 492 (Alaska 1977), although the trial court set forth reasons for its ultimate conclusion, we noted:

[I]t is unclear whether the trial judge found: (1) that there was an insufficient amount of evidence regarding Alto's insanity introduced to trigger the state's burden of proving his sanity beyond a reasonable doubt, or (2) that sufficient evidence of Alto's insanity was introduced to raise the issue, but the state's consequential burden of proving him sane beyond a reasonable doubt was met.

565 P.2d at 496.

Continuing problems in this area have convinced us that in the future, the superior court should make an adequate record in such cases. The determination is plainly bifurcated. When a defendant raises the affirmative defense of insanity, he has the initial burden of going forward and presenting "some evidence" supporting the defense. Once the court is convinced "some evidence" has been presented, it should so state on the record. At that point, it is for the prosecution to prove that the defendant is sane beyond a reasonable doubt. The court must, at the conclusion of its consideration of that question, clearly state on the record what it has found. The court must find the defendant sane beyond a reasonable doubt before it can find him guilty of any offense.

was sane when he killed the victim. In making this determination, "the evidence and inferences to be drawn from the evidence must be viewed in a light most favorable to the state." [6]

The two-part statutory test requires that there be reasonable doubt that Smith lacked substantial capacity either to appreciate the wrongfulness of his actions or to conform his actions to the requirements of the law. The state correctly points out that only the second part of the test was at issue in this case.

All the evidence points to a finding that Smith had substantial capacity to appreciate the wrongfulness of his conduct when he shot Officer Jordan. Smith admitted in his statements to the police that what he did was illegal and morally wrong. All three medical experts testified that Smith, even if suffering from a mental illness, could appreciate the wrongfulness of his conduct. The record contains no contrary evidence. Thus, the focus of our review is on the second prong of the legal responsibility test: whether Smith had substantial capacity to conform his conduct to the requirements of the law when he shot Officer Jordan.

We must determine whether there was sufficient evidence to support the conclusion by the superior court that Smith had substantial capacity to conform. The primary evidence on this question was the testimony and reports of the three medical experts. While Drs. Robinson and Langdon concluded that Smith could not conform his behavior to the requirements of the law at the moment of the shooting, Dr. Rader believed he could. Undoubtedly, the superior court's judgment was based, at least in part, on a conclusion that Dr. Rader's testimony and report were the most compelling.

Dr. Rader set forth his reasoning at length in the report he initially filed with the court. Rader concurred with the basic findings of the other experts that Smith was a schizophrenic.[7] However, he concluded that the conduct that was exhibited on September 28, the shooting of Leon Jordan and its surrounding circumstances, was not a product of that illness. Although Rader's personal examination of Smith revealed characteristics of schizophrenic behavior, Smith also displayed Ganzer syndrome. Ganzer syndrome or prison psychosis is a condition in which one attempts to appear insane, or less sane than one is, for the advantages of being thought insane.

He malingers his idea of crazy thinking, not appreciating that he in fact does have an underlying thought disorder. His malingering is designed to obscure the fact that his actions and his behavior clearly were intentional, in the service of an identifiable goal (to get out of the service) by unacceptable behavior. His intention was to be more of a problem than he was worth. In this respect he was successful and was being processed from the service.

This malingering partially explains a seemingly ever more fantastic set of tales told by Smith to justify the shooting[8] and a set

---

6. *Alto v. State*, 565 P.2d 492, 498 (Alaska 1977) (footnotes omitted).

7. Rader stated he agreed with the basic diagnosis of schizophrenia, but he was not sure that it was chronic undifferentiated type, concluding instead that it was paranoid schizophrenia.

8. Dr. Rader, when testifying and asked to give examples of such behavior, noted:

Well, first of all, he explained as best he could a kind of—of notion of a vendetta that had been going on for some time and seemed to be based partly on a meeting that took place some time in the military. Part of it was based upon that a friend had accosted him before he went in the service and he was an addict and wanted him to do something

for him. Part of this—this vendetta idea was based upon the fact that in New Jersey there had been a Ku Klux Klan meeting back in the early '60's and it was a kind of rambling, disjointed scenario that was meant to explain why somebody had a gun on the street looking for him on this particular day that he stole the truck from the military and left the Post without authorization. To me, that's clearly a man that's fabricating things in the service of an idea, that it wasn't to get away from the policeman, to protect himself, to steal a truck, it was something else other than what it obviously was. That I think is unreliable.

of test responses given by Smith to Rader that displayed both schizophrenia and an intentional distortion on his part of the results.[9] Rader stated that a medical finding of schizophrenia does not necessarily mean that a person is not legally responsible for his actions. In this case, Rader concluded that Smith could both understand and know the wrongfulness of his behavior and could conform his behavior to society's norms. In his report, Rader was of the opinion that the conclusions of the previous psychiatric evaluations were not supported in the reports [10] and the conclusions of legal insanity only based on the existence of the thought disorder, schizophrenia. Rader stated that it was important to focus on the "behavior, ideation and motivation of the defendant at the time" of the shooting. His conclusions were as follows:

> In looking at the incident itself, this examiner comes to the conclusion that his behavior was consistent and reasonable in terms of his intention at that time. His

intention was to leave the post, to leave Alaska as quickly as possible. In this regard he showed faulty judgment in his decision to leave that day, irrespective of the discharge process. It is felt that he also used poor judgment in expecting to be able to leave Alaska by going toward Seward. Thirdly, it is felt that his judgment was poor for him to think that he could find shelter in a suburban neighborhood. On the other side, his behavior did seem consistent and reasonable insofar as: One, he was able to collect his personal possessions and have them in order. Second, he was able to impress his peers with his intentions in spite of his having a poor relationship and reputation as being a difficult person. Thirdly, he attempted to procure a driver for the vehicle, which seemed reasonable. Fourthly, he was able to accept refusal of the driver and still proceed with his plan to procure a vehicle. Fifth, he appreciated that the gate could be alerted and was able to

---

He said that—again, he said that he was a yeti down in college. When he was asked what this meant he stated that he had been in refrigeration course in college in Wasilla or near Wasilla somewhere and a sergeant threatened to yank him into the college about something. Well, this didn't fit anything I knew about refrigeration school in Wasilla. Rader later testified that Smith lacked a systemized delusion and seemed to have no emotional investment in any particular explanation. The state summarized the various "delusions" of Smith as follows:

> [H]e told police he shot Jordan because he wanted to elude capture and selected the Black person pursuing him merely because of latent racial bias. Later on Smith told Langdon a tale about the mafia and his need to rescue an unnamed girlfriend in New Jersey. Finally, Smith told Dr. Rader that the Ku Klux Klan and a former drug addict friend were after him.

9. Dr. Rader summarized his evaluation of the tests he gave Smith during his interview as follows:

> Summary of the mental status findings showed the defendant to have some inappropriate affect; a tendency for looseness associations; a tendency for concrete thinking, and limited judgment. It also became evident that he understood a relevant response by his choice of irrelevant responses. His error in reverse counting demonstrated an approximate error also characteristic of de-

fendants with Ganzer Syndrome or prison psychosis. This was displayed, too, in his tendency to give similarities for dissimilarities and having no idea of the simple similarity between a river and an ocean. A paranoid orientation is in his responses. In this examiner's opinion, the defendant showed an underlying thought disorder which was submerged under a willful, contrived, and intentional distortion and fabrication in the service of being seen as mentally ill.

Smith, in his reply brief, contends that this "faking" at the exam does not establish Smith's ability to control his actions on the day of the shooting. The malingering, found by Rader, could suggest (taken in the light most favorable to the state) that Smith was more in control of his actions by his ability to "fake" test results and make up new explanations for his actions. It also suggests that the conclusions of Langdon and Robinson are possibly based on misleading information supplied by Smith.

10. Due to the different conclusions reached by each psychiatrist, both were examined as to the reason they did not reach the conclusion of the other. Rader's basic position was that Langdon's terse report gave no clue to his findings, and Rader could find no basis. Langdon stated that, given the reasons set forth in Rader's report, Rader should have come to Langdon's conclusion that Smith was not legally responsible.

successfully negotiate the gate without complications. Sixth, he was able to appreciate imminent capture when confronted by the presence of several police cars. Seventh, he was able to elude search until he was discovered, he discriminated between his captors and picked the person with the handgun over the one with the shotgun and he picked a black person in civilian clothes. Eighth, he was able to surrender without getting killed after having wounded an officer and known to be armed.

Because of the internal consistency of his actions in terms of their being reasonable and consistent to his motivation, because he had knowledge of his actions, had knowledge of the wrongfulness of his act, and because he is malingering major mental illness in the face of a mental illness, this examiner is not persuaded that his actions were a function of his emotional disorder, which does indeed exist.

Rader's testimony elaborated on these points. Rader was persuaded, beyond a reasonable doubt,[11] that Smith's actions of September 28 were not a product of a delusional paranoid system.

Dr. Langdon's report concluded that Smith was suffering from chronic undifferentiated schizophrenia in acute exacerbation and that "he was capable of knowing the nature and quality of his actions, but not of conforming his behavior to societal norms." Langdon focused on the existence of delusions ordering Smith's conduct, especially the story that the Mafia were after

Smith's girlfriend in New Jersey. When questioned as to the two paragraphs of Dr. Rader's report, quoted *supra*, Langdon stated:

> Those two paragraphs—one of the things that he says here is that these various points along here, they're reasonable. Well, of course they are reasonable in terms of his intention at that time, and my impression is that his intention at the time was based on delusional ideation and that therefore the whole reasonable process thereafter was based on the mental illness.

Langdon thought that all schizophrenics lacked the ability from time to time to conform their conduct to the requirements of the law. In this case, according to Dr. Langdon, Smith

> decided to act upon the delusions in spite of the obvious more reasonable course of behavior he could have taken and the violence arose out of that, probably was not planned and not intended.

Langdon believed that Smith was acting under a delusional framework for the entire period and that most of the time there was no reason to violate societal norms in carrying out his plan, but when they interfered with his delusional plans, Smith would violate these norms.

Robinson, the clinical psychologist, gave Smith a battery of psychological tests and originally concluded that Smith was psychotic, unable to participate in his defense, and possibly had organic brain dysfunction.[12] After another examination, he

---

**11.** Smith argues on appeal that Rader's testimony was fatally infected by an erroneous burden of proof assumption. This argument appears misguided, since it is irrelevant upon what standards the experts base their conclusions as long as those standards are clear on the record for the trier of fact to consider as part of weighing their testimony, and the trier of fact applies the correct burden of proof standard. Rader's testimony was a jumble of legal jargon and medical theory. When he stated that he need not be "persuaded beyond the shadow of a doubt that any piece of behavior is not influenced by illness when a man's sick," Rader seems to mean only that the medical illness and the concept of legal responsibility

are not congruent. Such a statement, in no sense "infects" the credibility of Rader's conclusion. Further, given Rader's statement that he is convinced beyond a reasonable doubt that Smith is sane, the weight of any earlier statement should be discarded.

**12.** Specifically, Robinson noted:

> *Analysis of Test Results*: Mr. Smith is psychotic. He functions at the intellectual level of a mentally defective person because of the destructive effects of his mental illness on his cognitive abilities. His grasp of reality is poor. His own bizarre concerns distort his understanding of the world around him. His thinking is confused and though he has paranoid thoughts, he has not developed well

joined Dr. Langdon in finding that Smith was competent to stand trial and was merely suffering from schizophrenia. Robinson concluded from the tests that Smith's

> responses fit very closely with paranoid schizophrenia and a man who has limited intellectual ability and who has some vaguely articulated delusions, ideas of reference and other paranoid kinds of symptoms.

When asked whether the acts surrounding the shootings could have taken place apart from Smith's mental illness, Robinson responded:

> I really—in trying to turn that over in my mind, I just can't see how, because this man was in a high drive state, his feelings were—really—apparently really mixed up and tense and so how in the world could this man have done this without the presence of thought disorder which seemed to come out in the testing when he was intense?

As to Rader's argument as to the internal consistency of the events of that day, Robinson explained:

> I do not see how. I see them consistent with a diagnosis of schizophrenia in terms of the chaos that occurred with him. He was able to perform some functions such as driving the car and so forth which you expect schizophrenics to do, but in terms of making big decisions about judgment, how he was going to get to the Lower 48 and so forth, I do not—I do not see that there was any clear judgment there at all.

In considering the evidence in the light most favorable to the prosecution, we think that the court could have been persuaded that Dr. Rader's opinion was the most compelling and have concluded beyond a reasonable doubt that Smith was sane. In *Miller v. ITT Arctic Services*, 577 P.2d 1044 (Alaska 1978), we held that there was substantial evidence to support the state workers' compensation board's finding that the injury was not work related when of three medical experts testifying, one so found unequivocally while the other two were of the opposite opinion. In so holding, we stated that the trier of fact can adopt the findings of one medical expert, not substantially impeached, over the findings of a greater number of other medical experts who come to an opposite conclusion.

Further, the trial court is not bound by the medical testimony and can make its own analysis of both lay and expert testimony.[13] In *Dolchok v. State*, 519 P.2d 457, 460 (Alaska 1974), the trial court's conclusion did not have the clear support of the only medical expert in the case:

> From a reading of this psychiatric evidence, and of the entire record, there emerges a picture of a man who is to some degree mentally disturbed. He may well have schizoid or schizophrenic symtomatology, as Dr. Langdon testified. But the ultimate question for the judge to decide was whether the schizophrenic aspect of appellant's personality substan-

---

ordered and systematized delusions. He has body concerns, especially about his internal organs, and is defending against the thoughts that there is something terribly wrong with his organs. He may superficially understand the difference between right and wrong, but he cannot think very deeply about such matters without becoming confused and disorganized. As he now functions, he could not meaningfully participate in his own legal defense. He does not have much control over his feelings and he is unpredictable in what he might do. Destructive acts toward others or himself could easily occur. That he is psychotic now and does not attempt to maintain what contact he has with reality, and because of the pattern of his intellectual deterioration, it is likely that he has been psy-

chotic for a considerable time. The bizarre effects of his psychosis on his performance made it impossible to determine if he has (organic) brain dysfunction concomitant with his psychosis. In summary, Mr. Smith is actively mentally ill. His psychosis has had a destructive effect on his cognitive abilities and he could not participate meaningfully in his own legal defense. He may have a superficial understanding of the difference between right and wrong, but he is incapable of thinking clearly about such matters to any significant depth. It is likely that he has been psychotic for a considerable period of time.

13. *Alto v. State*, 565 P.2d 492, 503 n. 17 (Alaska 1977).

tially incapacited him from conforming his conduct to law. The judge found that it did not, and we believe there was substantial evidence to support this finding. Dr. Langdon commented on appellant's ability to control his conduct before and after the shooting. He said:

[H]e had stopped himself from doing certain things earlier. He'd run out of stops, I guess . . . . Now, a certain number of controls after the shooting came back again, probably because of the discharge of emotion.

What Dr. Langdon seems to be saying is that despite appellant's mental illness, he had the ability to control his actions— in the face of adversity—up to the time of the shooting, that at that moment he suddenly lacked the capacity to control himself, but that as soon as the shooting was over he regained his self-control.

The lay testimony in this case also supported Rader's general conclusions as to the lucidity of the actions committed by Smith on September 28. According to his superiors, although Smith showed signs of dissatisfaction, his year in the army was devoid of additional bizarre behavior.[14]

■ Considering all the evidence, both lay and expert testimony, we conclude that the prosecution presented substantial evidence to prove beyond a reasonable doubt that Smith was legally sane at the moment he shot Officer Jordan. Thus, we affirm Smith's conviction.

Smith was sentenced to fifteen years imprisonment with five years suspended for his conviction of shooting with intent to kill, wound or maim, with the directive that he be placed in a facility where psychologi-

cal treatment is available, and that he attend therapy sessions on probation as his probation officer so requires. Conviction of a violation of AS 11.15.150 carried a penalty from one to twenty years.[15] Smith contends that his sentence is excessive and that the court failed to consider all the *Chaney* criteria[16] in light of Smith's mental illness.

Smith's prior record consisted of a ninety-day sentence on a disorderly conduct conviction in 1967 and a $20 fine for speeding and assault and battery in 1970. In 1965, he had been on juvenile probation for one year for driving without a license and with fictitious plates. Smith's only known employment is military, and the present offense was committed during Smith's second term in the army. He is not known to have gained any civilian job-related skills. His mental history shows, as has already been discussed, a chronic thought disorder of either paranoid or undifferentiated schizophrenia. This could perhaps be partially explained by Smith's childhood which reflects trauma and neglect.

■ This type of assault, shooting a police officer acting in his official capacity while attempting to apprehend an offender, is very serious. We think the circumstances constitute grave aggravating factors. It is perhaps only luck that this incident did not cost Officer Jordan his life. In *Fox v. State*, 569 P.2d 1335 (Alaska 1977), we affirmed a twenty-year sentence for firing at a policeman while fleeing from the commission of an armed robbery. Three other convictions for shooting with intent to kill, wound or maim have all been affirmed for sentences from ten to twenty years.[17] This sentence is clearly not excessive considering others for this offense.

14. Sergeants Wells and Zemke, talking of their daily contact with Smith for the year previous to the incident stated that Smith had not displayed any bizarre behavior. Captain Tucker, whose contact was less substantial, felt that his behavior was not bizarre but apathetic and tended to be "spaced out."

15. *See* note one *supra.*

16. *See State v. Chaney*, 477 P.2d 441, 444 (Alaska 1971).

17. *Johnson v. State*, 595 P.2d 985 (Alaska 1979) (15 years for a premeditated attack on a witness to an alleged act of statutory rape committed by the appellant); *Christie v. State*, 580 P.2d 310 (Alaska 1978) (10 years with three suspended for a postmarital shootout); *McCracken v. State*, 521 P.2d 499 (Alaska 1974) (two 20 year sentences for a barroom attack reversed as to double jeopardy for further convictions of use of a firearm in an assault).

The trial court also did not fail to consider Smith's mental condition. In this case, the court carefully considered the existence of Smith's thought disorder, both in its discussion of the *Chaney* criteria and in its sentence which included a detailed recommendation, to insure that Smith got treatment for his mental illness. We do not find that the sentence is clearly mistaken.

AFFIRMED.

BURKE, J., not participating.

BOOCHEVER, Justice, dissenting.

Since there was evidence supporting the defense of insanity, the state had the burden of proving beyond a reasonable doubt that Smith was sane according to the standard set forth in AS 12.45.083(a).[1] Although there was no dispute that Smith was suffering from a mental disease, the experts agreed that he had capacity to appreciate the wrongfulness of his conduct. The sole issue is whether, as a result of the mental disease, he lacked substantial capacity to conform his conduct to the requirements of law. In my opinion, the state has failed to meet its burden of proving beyond a reasonable doubt that Smith had substantial capacity to so conform his conduct at the time of the shooting.

All of the medical experts agreed that Smith was suffering from a mental disease and the trial court so found. Smith's history is replete with periods of serious mental illness requiring repeated hospitalizations. Some of the prior incidents involved violent irrational conduct. Thus, in a report of July 24, 1973, Dr. M. A. Hayes of the Marlboro State Hospital states that when Smith was taken to that hospital in an ambulance he attacked the driver of the car. "At the time of admission . . . there was [sic] some suicidal ideations and there were also some paranoid ideations; he thought people were planning against him. . . . States he has a history of being arrested in the past for vicious conduct when he was 18." He was admitted to the Lyons Veterans Administration Hospital in 1973 for three and one-half months. The report of Dr. A. Beke of that hospital, who diagnosed Smith as "schizophrenia paranoid," states:

This 25 year old, white male veteran was admitted for the first time to VA Hospital, Lyons because of confusion, religious preoccupation, assaultive and unpredictive behavior, feeling of depression, ideas of reference, auditory and visual hallucination. During his hospitalization, he showed gradual improvement in his condition. Apparently, prior to his hospitalization he misidentified people and on one occasion he jumped on a moving truck pulling off the driver because he believed that the driver was his father-in-law. . . . Also, the veteran attacked a patient, trying to choke him and attacked an aide.

On October 16, 1975, he was taken to the Philadelphia General Hospital by police because of his aggressive assaultive behavior toward police. On October 22, 1975, he was again admitted to the Veteran's Administration Hospital "because he was not able to cope with the outside world."

On admission, the patient was confused, lacking identity, having a defiant attitude and exhibiting an adversive variable behavior. The patient didn't have hallucinations but presented himself with delusional ideas of not being the same person, talking about going to immigration to get his identity changed. He didn't show homicidal or suicidal feelings. Insight and judgment were impaired.

This is a patient with previous admissions to psychiatric institutions owing to symptoms consistent with the same for which he has been admitted to this hospital.

He was also diagnosed as a "paranoid schizophrenic."

Smith reenlisted in the Army and, prior to the shooting incident, had been referred twice to the mental hygiene clinic by his commanding officer. Captain Tucker stated that Smith "always seemed to be somewhere else . . . spaced out . . ." Most of the time "we didn't know where he

---

1. AS 12.45.083 is quoted at pages 302–303 of the majority opinion.

was at." Yet he was not involved with drugs. On one occasion the captain talked with him for twenty minutes and didn't know what Smith was talking about.

Sergeant Zimmerman, who was acquainted with Smith for approximately eight months, observed Smith doing all kinds of weird and bizarre things. In Zimmerman's opinion, Smith was getting worse in appearance and attitude. "He walked around the military complex in a daze."

It is with this overwhelming background of mental illness that the events of September 28, 1977, must be evaluated. On that date Captain Tucker called Smith into his office and explained to him that he was being processed out of the Army and that in about seven days he would be out of the military. It was on this same day that the bizarre events occurred which led to his conviction. Yet the only doctor who testified that Smith was capable of conforming his conduct to the requirements of law [2] based his conclusion that Smith was not legally insane on a theory that he was motivated by "an identifiable goal (to get out of the service) by unacceptable behavior." In looking at the incident itself, Dr. Rader concluded that Smith intended to leave Alaska as quickly as possible. No rational explanation is even hinted at which would explain the commandeering of a vehicle immediately after Smith had been advised that he was being discharged within seven days. Similarly, the fact that Smith drove toward Seward, a direction which would not serve his purpose of leaving Alaska, is disregarded by Rader as mere "faulty judgment."

It is true that during the course of his wild conduct individual acts could be said to be meaningful, but such actions are not inconsistent with a lack of substantial ability to conform conduct to the requirements of law. In fact, it is well recognized that

one may perform intelligent acts in the pursuit of delusionary goals.[3]

The majority refers to the case of *Dolchok v. State*, 519 P.2d 457 (Alaska 1974). There, Dolchok murdered a taxicab driver in the course of robbing him. Dolchok was clearly motivated by the rational, although reprehensible, goal of robbing the driver. Here there is no rational explanation for Smith's leaving the base and driving toward Seward.

In the total absence of any suggested rational motive for Smith's violent conduct and abrupt departure, and in view of his lengthy history of prior irrational violent conduct and admitted mental illness, I conclude that the state failed to meet its burden of proving that Smith was sane beyond a reasonable doubt.

---

2. All three doctors who examined Smith agreed that he was schizophrenic. Two concluded that Smith could not conform his behavior to the requirements because of his mental illness.

3. In S. Arieta, American Handbook of Psychiatry at 509 (1959), the following is stated:

He (Kraeplin) defined paranoia in terms of an insidiously developing, unchangeable delusional system, accompanied by clear and orderly thinking outside of the system, and without hallucinations. This is essentially the definition accepted in psychiatry today.